Filed 5/3/21  P. v. Nunez CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RODOLFO NUNEZ et al.,<br><br>Defendants and Appellants. | E071815<br><br>(Super.Ct.Nos. FWV17003089 & FWV17003091)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT

The petition for rehearing filed on April 29, 2021, is denied.  The opinion filed in this matter on April 28, 2021, is modified as follows:

On page 5, in the paragraph that begins, "We find no merit to each defendant's claims," replace "Rodriguez's claim" with "defendants' claims."  The paragraph should read:

1

We find no merit to each defendant's claims of trial error and no merit to defendants' claims that the matter must be remanded for the court to consider whether to impose a lesser firearm enhancement on count 1.

On page 99, in the paragraph that begins, "But in *Yanez,*" remove "(plur. opn. of Ramirez, J.)." The paragraph should read:

But in *Yanez*, this court followed *Tirado*, not *Morrison*. (*Yanez, supra,* 44 Cal.App.5th at p. 459 ["[N]othing in the plain language of sections 1385 or 12022.53, subdivision (h) suggests an intent to allow a trial court discretion to substitute one sentencing enhancement for another."]; see also *Valles, supra,* 49 Cal.App.5th at pp. 165-167 [similarly concluding that "[t]he express language of sections 1385 and 12022.53, subdivision (h)" does not "authoriz[e] the substitution of a lesser enhancement for a greater enhancement, properly found true at trial, and for which there is no legal impediment to imposition"]; but see *Valles*, at pp. 170-172 & fn. 1 (conc. opn. of Menetrez, J.) [finding insufficient basis to depart from this court's decision in *Yanez*, but agreeing with *Morrison*, noting that *Tirado* and *Yanez* "frame[d] the issue incorrectly by asking whether the amended statute 'conveys the power to change, modify, or substitute a charge or enhancement,' " and concluding that the correct question is whether the court, "having exercised its power under the amended statute to strike a greater enhancement," "*still has its previously recognized power to impose an uncharged lesser*" enhancement].) Based on this court's decision in *Yanez,* remand for resentencing on each defendant's section 12022.53, subdivision (d) firearm enhancement is unwarranted.

These modifications do not change the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS _____
J.

We concur:


RAMIREZ _____
P. J.


McKINSTER _____
J.

Filed 4/28/21  P. v. Nunez CA4/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RODOLFO NUNEZ et al.,<br><br>        Defendants and Appellants. | E071815<br><br>(Super.Ct.Nos. FWV17003089 & FWV17003091)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Ingrid Adamson Uhler, Judge.  Affirmed in part; reversed in part with directions.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant Rodolfo Nunez.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant Alfredo Rodriguez.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel J. Hilton, Deputy Attorney General, for Plaintiff and Respondent

1

# I.  INTRODUCTION

Defendants Rodolfo Nunez and Alfredo Rodriquez were tried together before separate juries and convicted of the first degree premeditated murder of Ofakitonga Kofu on July 10, 2017.  (Pen. Code, §§ 187, 189, subd. (a),[1] count 1.)  Rodriguez was also convicted of unlawfully possessing a firearm as a felon.  (§ 29800, count 2.)

Rodriguez's jury (the red jury) further found that Rodriguez personally and intentionally discharged a firearm in the commission of the murder (§ 12022.53, subd. (d)), and that Rodriguez committed the murder and unlawfully possessed the firearm for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  Nunez's jury (the blue jury) found that a principal (Rodriguez) personally and intentionally discharged a firearm in the commission of the murder (§ 12022.53, subd. (d)), and that the murder was committed for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1)(C).)

Rodriguez was sentenced to five years plus 60 years to life.[2]  Nunez was sentenced to 50 years to life.[3]  The court ordered each defendant to pay a $300 restitution

---

[1] Undesignated statutory references are to the Penal Code.

[2] Rodriguez's five-year determinate term includes the middle term of two years on count 2, plus three years for the gang enhancement on count 2.  On count 1, Rodriguez was sentenced to 25 years to life, plus 25 years to life for the firearm enhancement, plus 10 years for the gang enhancement.

[3] Nunez's sentence is comprised of 25 years to life for the murder, plus 25 years to life for the firearm enhancement.  The court imposed but stayed a 10-year term on Nunez's gang enhancement on count 1.

fine (Pen. Code, § 1202.4, subd. (b)) and $70 in court assessments on each of their convictions. (Pen. Code, § 1465.8; Gov Code, § 70373.)

Rodriguez raises 10 claims of trial, sentencing, and clerical error. He first claims that his murder conviction must be reversed because the trial court prejudicially erred (1) in denying his motion to suppress the statements he made during his police interview after he unequivocally invoked his right to counsel; (2) in allowing the prosecution's gang expert to testify to case-specific hearsay—namely, that his gang, the El Monte-Flores (EMF) was required to follow directions from the Mexican Mafia and targeted African- Americans; (3) in excluding evidence of Kofu's prior robbery conviction (Evid. Code, § 1103); and (4) in admitting hearsay statements from a 911 caller who reported hearing the shooting and persons making statements at the time of the shooting. Rodriguez also claims (5) the prosecutor misstated the law of premeditation and deliberation during closing argument; and (6) the cumulative effect of the trial errors requires reversal of his murder conviction.

Regarding sentencing, Rodriguez claims (7) remand for resentencing is necessary so the court may consider whether to impose a lesser firearm enhancement on count 1; (8) his 10-year term on the gang enhancement in count 1 is unauthorized and must be stricken in favor of making his life term on count 1 subject to a 15-year minimum parole eligibility period (MPEP) (§ 186.22, subd. (b)(5)); and (9) the trial court violated his due process rights in imposing the $300 restitution fine and $140 in court assessments without determining whether he was able to pay them. Lastly, Rodriguez claims that

(10) clerical errors in the sentencing minute order and his abstracts of judgment must be corrected.

Nunez raises 12 claims of trial and sentencing error. He claims his first degree premeditated murder conviction must be reversed because (1) insufficient evidence shows he directly aided and abetted Rodriguez in committing the murder; (2) the instructions, including CALCRIM No. 403, erroneously allowed the jury to convict him of first degree premeditated murder based on a natural and probable consequences theory; and (3) effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) eliminated liability for murder based on the natural and probable consequences doctrine, and the legislation applies retroactively to nonfinal judgments on direct appeal.

Nunez also claims (4) the prosecution failed to prove the primary activities element of the gang enhancement allegation in count 1; (5) the prosecution's gang expert was erroneously allowed to testify that, because the murder was preceded by a gang confrontation, it was reasonably foreseeable that a murder would result; (6) the trial court prejudicially erred in admitting Rodriguez's hearsay statements that Nunez was the aggressor in the confrontation with Kofu; (7) the trial court erroneously admitted the 911 caller's hearsay statements (Rodriguez's 4th claim of error); (8) in closing argument, the prosecutor misstated the elements of aider and abettor liability for premeditated first degree murder; (9) the matter must be remanded for resentencing so the trial court may consider whether to impose a lesser firearm enhancement on count 1 (Rodriguez's 7th claim of error); (10) trial court violated his due process rights in imposing a $300 restitution fine and $70 in court assessments without determining whether he was able to

4

pay them (Rodriguez's 9th claim of error); and (11) the cumulative effect of the trial errors requires reversal. Lastly, Nunez joins Rodriguez's eighth claim of error, that (12) the 10-year gang enhancement on count 1 was unauthorized and must be stricken in favor of subjecting Nunez's life term on count 1 to a 15-year MPEP.

We find no merit to each defendant's claims of trial error and no merit to Rodriguez's claim that the matter must be remanded for the court to consider whether to impose a lesser firearm enhancement on count 1. We further conclude that any error in imposing the $300 restitution fines and $70 per-conviction court assessments, without determining that defendants were able to pay them, was harmless beyond a reasonable doubt because the record shows that each defendant will be able to pay the fine and assessment amounts over time. The People concede, and we agree, that each defendant's 10-year gang enhancement on count 1 was unauthorized and must be stricken from each defendant's sentence, and that each defendant's indeterminate 25-year-to-life term on count 1 must instead be made subject to a 15-year MPEP. (§ 186.22, subd. (b)(5).)

We modify each defendant's sentence accordingly, and we remand the matter to the trial court with directions to prepare supplemental sentencing minute orders and amended abstracts of judgment, reflecting our modifications to each defendant's sentence regarding the gang enhancements and the 15-year MPEPs. In all other respects, we affirm each defendant's judgment of conviction and sentence.

## II. FACTUAL BACKGROUND

A. *Evidence Admitted Before Both Juries*

1. The July 10, 2017 Shooting Death of Kofu

Around 11:30 a.m., on July 10, 2017, Rodriguez shot and killed Kofu following an argument between Kofu and Nunez outside of Kofu's home in Fontana. Kofu's brother, Tali, testified that Kofu was upset and angry that morning because Kofu had an argument with his mother. Kofu was affiliated with the Bloods street gang and regularly wore a red bandana on his right side, reflecting the gang's color and style.

A passerby, Jose V., saw Rodriguez shoot Kofu. At the time of the shooting, Jose V. had known Nunez for a long time and had seen Rodriguez once before. Jose V. was driving past Kofu's house, with his windows down, when he saw Kofu standing outside of Kofu's house and saw Nunez's car stopped in the intersection "across the street" from Kofu's house. Nunez was driving, and Rodriguez was in the front passenger seat.

As Jose V. drove between Nunez's car and Kofu, he heard Nunez and Kofu arguing. Jose V. slowed down and watched the altercation in his rearview mirror. Jose V. had his windows down, and he heard Kofu yelling at Nunez that this was Kofu's block and to pick up trash or beer bottles that had been thrown from Nunez's car. Nunez refused to pick up the trash or beer bottles, got out of his car, and challenged Kofu to a fight. Jose V. saw that Nunez and Kofu had their fists up and were walking toward each other, but he then saw Nunez take several steps back and heard Nunez yell, " 'Sacala huey,' " to Rodriguez, which is Spanish for "Get it out." Rodriguez then got out of the car with what looked like a sawed-off shotgun and shot Kofu from a distance of around

6

10 feet. Kofu fell to the ground and began crawling away from Rodriguez and Nunez. Jose V. then drove away.

Tali was inside Kofu's house when he heard one gunshot, followed by two more, then heard Kofu yelling for help. Tali ran outside and saw Kofu crawling on the ground and a car in the street. Someone was walking quickly toward the car's passenger side as the driver, who was in the car, was yelling: " 'Hurry up. Get in fool. Get in. Let's go.' " Tali ran toward the passenger but the passenger got in the car, and the car sped away.[4] Tali did not see the faces of the driver or the passenger. Tali then tried to help Kofu.

### 2. The Anonymous 911 Call

An anonymous person called 911 at 11:38 a.m., on July 10, 2017, and reported the shooting, which the caller said happened three minutes earlier, or around 11:35 a.m. The caller said he/she would "rather stay anonymous" but indicated that he/she lived near the shooting and heard, but did not see, the shooting.

The caller said that they first heard a gunshot, then heard someone say, " 'No, no, I'm sorry, I'm sorry,' " then heard another person say, " 'I told you not to fuck with me!' " The caller then heard "at least" two more gunshots. A recording of the 911 call was played for both juries. Before trial, Jose V. told a detective that he heard Nunez say, "I told you not to fuck with me."

---

[4] A surveillance video showed what appeared to be Nunez's car driving away from the area near Kofu's home shortly after the shooting.

3. The Investigation

Shortly after the shooting, police found a shotgun shell and a red bandana on the ground near Kofu's home. An autopsy showed that Kofu died from three shotgun wounds to his legs,[5] and that Kofu had methamphetamine, amphetamine, and marijuana in his system.

4. S.A.'s Police Interview Statements and Trial Testimony

Police interviewed Rodriguez's cousin, S.A., in August 2017, and a recording of the interview was played before both juries. During her interview, S.A. said that Rodriguez was from El Monte, but he had recently been staying at S.A.'s home with S.A. and her family in Fontana. Rodriguez and Nunez, whom S.A. knew as "Gallo," were friends, and Nunez picked up Rodriguez from S.A.'s home on the morning of July 10. S.A. did not like Nunez because he used methamphetamine.

Later during the morning of July 10, 2017, Rodriguez called S.A. and told her he had shot someone. Rodriguez told S.A. that Nunez had started arguing with an African-American man, and that Nunez got out of his car to fight with the man. Rodriguez told Nunez to get back in the car, but Nunez would not listen, so Rodriguez also got out of the car, then "three Black guys" tried to "jump" Rodriguez, one of the men "socked"

---

**5** The coroner testified that the first shot was apparently fired while Kofu was standing because one of Kofu's three gunshot wounds had a downward trajectory. The other two gunshot wounds had upward trajectories, with one hitting the front of Kofu's legs and the other hitting the back of his legs, suggesting that Kofu was on the ground when these two shots were fired. The coroner conceded that upward trajectories could have been caused if the shots ricocheted off the ground before hitting Kofu when he was standing; but the coroner did not find any asphalt in Kofu's wounds, which was expected if the shots had ricocheted.

8

Rodriguez, and Rodriguez then shot the man who "socked" him. Rodriguez's statements to S.A. indicated that Rodriguez shot Kofu in self-defense or in defense of Nunez.

Later on July 10, 2017, Rodriguez called S.A. again and said that he and Nunez needed money for gas, so S.A. and her mother met Rodriguez in the parking lot of the Montclair Plaza and gave him gas money. Nunez waited in his car while S.A. spoke to Rodriguez.[6] After meeting with S.A. and her mother at the Montclair Plaza, Rodriguez went to his mother's home in El Monte and then returned to S.A.'s home in Fontana later that night.

Rodriguez asked S.A. to drive past the location of the shooting, but when she went there, she saw that the police had the area blocked. Nunez lived near the location of the shooting, and it appeared to S.A. that Nunez had problems with the person whom Rodriguez shot.

Rodriguez had a small shotgun that he carried with him in a guitar case. When he returned to S.A.'s home on July 10, 2017, after going to his mother's home in El Monte, Rodriguez no longer had the shotgun with him. Sometime later, one of Rodriguez's friends from his gang brought the shotgun back to Rodriguez at S.A.'s home, and Rodriguez sold the gun to someone who lived near S.A. S.A.'s father kept a full-size shotgun in S.A.'s home. When police searched S.A.'s home, they found a full-size

---

[6] Surveillance videos showed Nunez's car at the Montclair Plaza at 11:57 a.m., on July 10, 2017; Rodriguez talking to S.A. in her mother's car at the Montclair Plaza; and Rodriguez later making purchases from a nearby gas station.

9

shotgun and some shotgun ammunition in the master bedroom and some of Rodriguez's clothing under the living room table.

S.A. testified at trial under a grant of immunity. She remembered meeting Rodriguez and Nunez at the Montclair Plaza to give Rodriguez gas money. At the time, Rodriguez was "stranded" and was on his way back to his mother's home in the El Monte. S.A. also testified that Rodriguez was a member of the EMF gang and his "hood name" was "Chano." But S.A. claimed to not remember many of the details of her conversations with Rodriguez and her police interview. She loved Rodriguez, would do anything for him, and did not want to testify.

5. Expert Gang Testimony

El Monte Police Department Detective Peter Lopez testified separately before each jury as an expert on criminal street gangs. He gave substantially the same testimony before both juries regarding the EMF gang and the customs and habits of criminal street gangs.

B. *Evidence Admitted Only to Rodriguez's Jury*

1. Rodriguez's Interview Statements

City of Fontana Police Department Detective Jose Ferreira interviewed Rodriguez on August 7, 2017, and a recording of the interview was played for Rodriguez's jury. During the interview, Rodriguez consistently denied any involvement in the July 10 shooting. Details of Rodriguez's police interview are discussed *post*, in section III.A.

2. Expert Gang Testimony

In testifying before Rodriguez's jury, Detective Lopez explained that he had been a police officer for nearly 20 years, and at the time of trial he was assigned to El Monte Police Department's gang unit. He had law enforcement-related training and experience with criminal street gangs, including the EMF gang. He had personally spoken with members of the gang and with other law enforcement agencies concerning the gang, and he had read other law enforcement officers' reports concerning the gang.

Respect is the "core" value or principle of any criminal street gang. Most gangs are territorial and, when a gang member claims a particular territory or neighborhood, it is considered a challenge to a rival gang member. In the gang culture, gang members are prohibited from cooperating with law enforcement and from testifying in court. Nongang members are also typically reluctant to cooperate with law enforcement or to testify in court about a gang because they fear retaliation by the gang. Gang associates are not gang members, but they hang out with the gang and are trusted by the gang.

Detective Lopez opined that EMF was a criminal street gang within the meaning of section 186.22. The gang had approximately 400 active members, and its primary activities included carjacking, robbery, unlawful firearm possession, drug distribution, residential burglary, and auto theft. Members of the gang had several predicate offenses. In 2015, one of its members was convicted of murder, and another was convicted of being a felon in possession of a firearm. In 2016, a third EMF member was convicted of auto theft and being a felon in possession of a firearm; and in 2017, a fourth EMF member was convicted of unlawfully taking a vehicle for the benefit of the gang.

Rodriguez was an active EMF member at the time of the July 10, 2017 shooting. On two prior occasions, in 2009 and 2013, Rodriguez admitted to Detective Lopez that he was a member of EMF. Rodriguez also had several EMF tattoos, including the letters "EMF" on his chin; a rose on his right cheek; and wildflowers on the back of his head, signifying his EMF gang membership. Rodriguez's cousin, S.A., had "openly stated" that Rodriguez was an EMF gang member.[7]

The Bloods are a criminal street gang that is aligned with African-Americans, Pacific Islanders, and Asians. Bloods are known to wear the color red on their right sides. If an EMF member is challenged by a member of a rival gang, the EMF member would be expected not to back down.

Detective Lopez opined that a hypothetical shooting committed under the circumstances of the July 10, 2017 shooting would benefit the EMF gang by enhancing the gang's status because the shooting was committed against "a rival Black gang member," who had disrespected the EMF by telling an EMF gang member, Rodriguez, and an EMF associate, Nunez, to do something—pick up trash. The shooting would be "a classic gang shooting." The point of firing two more rounds after the victim, Kofu, apologized, was to deliver the message that the perpetrators were to be feared and respected.

---

[7] The parties stipulated that Rodriguez had a prior felony conviction for purposes of count 2, in which he was charged with being a felon in possession of a firearm on July 10, 2017.

12

Detective Lopez further opined that the shooting would benefit the EMF gang because the gun used in the shooting was taken to El Monte after the shooting and ended up in the hands of another EMF gang member. In the EMF gang, guns that belong to the gang are known as " 'hood' " guns or " 'neighborhood' " guns. Such guns are passed around by EMF gang members, particularly if the gun has been used in a crime, in order to avoid the gun's being detected by law enforcement.

C. *Evidence Admitted Only to Nunez's Jury—(Nunez's Interview Statements)*

Detective Ferreira interviewed Nunez on August 6 and 7, 2017, after Nunez was detained during a traffic stop. An audio and video recording of the interview was played for Nunez's jury.

Nunez initially claimed he was at the probation department all day on July 10, 2017. When shown a photo of Kofu, he said he recognized Kofu from the neighborhood. When Detective Ferreira told Nunez that Kofu was dead and that Nunez's car was used in the shooting, Nunez then said he was only at the probation office for half the day on July 10.

Nunez said he had recently met "this guy," an EMF gang member who was staying in the same neighborhood and who knew Nunez's cousins. He did not know the guy's name. He had called the guy (later identified as Rodriguez) to ask him if he knew a place Nunez could rent because Nunez and his 14-year-old son were living on the streets. Rodriguez told Nunez to come over and pick him up where he was staying at his aunt's house in the neighborhood. Once there, Rodriguez was confrontational and said, "Don't fuck with me." When Nunez left to get in his car, Rodriguez suddenly jumped

13

into the front passenger seat, carrying a big bag containing a shotgun.  He pointed the shotgun at Nunez and told him to drive to where Nunez's son was staying or he would blow Nunez's head off.

Rodriguez told Nunez that he had to drop the gun off somewhere, and that he would give Nunez some money or buy some food for Nunez's son.  Nunez was scared. They picked up Nunez's son, bought him some food, and took him back to the house where he was staying.  Then they drove off in Nunez's car, drinking beer that Rodriguez had brought with him.  Rodriguez threw the beer bottles out of Nunez's car window. Then an African-American male on the street started "talking shit," said it was his street, and told them they had better pick up their "fucking Corona" bottles right now.  The African-American male then started to approach Nunez's car.

Nunez got out of the car, said to the African-American male, "What's your problem?" and told the man that he would pick up the bottles.  But the man got in Nunez's face, like he wanted to fight.  Nunez backed up and did not say anything. Rodriguez then got out of the car and shot the man.  The man then said, " 'You fucking bitches,' " and Rodriguez shot him again.  Rodriguez then pointed the gun at Nunez and yelled at Nunez to get back into the car and drive.  Nunez got back into his car and drove, while Rodriguez continued to point the gun at him.

Nunez drove onto the I-10 freeway and was running out of gas.  Rodriguez called his aunt for help and told Nunez to drive to the Montclair Plaza, where his aunt said she would meet him.  Nunez was waiting for a chance to run, but Rodriguez still had the shotgun pointed at Nunez's head.  Rodriguez's aunt and cousin were waiting at

Montclair Plaza. Rodriguez told them that he had just killed someone and needed some gas.

Rodriguez then directed Nunez to drive to a gas station. Rodriguez went inside the gas station to pay for the gas, and left his gun in the car. Nunez could not leave because he did not have any gas, and Rodriguez had already threatened to kill Nunez and his family if he did not cooperate. Rodriguez then told Nunez to drive to Rodriguez's mother's home in El Monte, and Nunez did so. When they arrived in El Monte, Rodriguez reminded Nunez that he would kill his family, and made Nunez erase Rodriguez's cell phone number from his phone. He told Nunez he " 'should have just killed [him] right now too,' " and that if the police got Nunez first, " 'you better say that you did it.' " Nunez did not report the shooting because of Rodriguez's threats.

## III. DISCUSSION

A. *Rodriguez Did Not Unequivocally Invoke His Right to Counsel During His Custodial Interview with Detective Ferreira*

Rodriguez claims he unequivocally invoked his right to counsel during his custodial police interview, and that the trial court prejudicially erred in denying his pretrial motion to suppress the statements he made following his right-to counsel invocation. Although he concedes that he waived his *Miranda*[8] rights at the beginning of the interview, he claims the interviewing detective should have immediately terminated

---

[8] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

15

the interview after he said to the detective, " '*I gotta call my mom about a lawyer because this is bullshit*.' "  (Italics added.)

The trial court ruled, and we agree, that Rodriguez's statement about calling his mother about a lawyer was not an unequivocal invocation of his right to counsel.  Thus, Rodriguez's motion to suppress his interview statements was properly denied.  Alternatively, we conclude any error in admitting Rodriguez's post-invocation statements was harmless beyond a reasonable doubt.

1.  Background

On August 7, 2017, Rodriguez was taken into police custody and interviewed by Detective Ferreira.  A video and audio recording of the interview was played for both juries.  The detective read Rodriguez each of his *Miranda* rights, including that he had "the right to an attorney before and during questioning"; and Rodriguez acknowledged that he understood these rights.

The detective then said, "Alright.  Listen, I'm not gonna bullshit you . . . .  [D]id anyone say anything to you about why . . . they [brought] you here?"  Rodriguez said, "No, I don't even know why I'm here."  Next, the detective asked Rodriguez whether he was at home when he was taken into custody on August 7, 2017.  Rodriguez said he was at home, and that he had lived "out here" for 40 days.  When asked whether he was "here" (that is, in Fontana) on July 10, Rodriguez said he was at his mother's house in El Monte.  When asked whether he was sure about that, and, "What if I was to tell you that I know you were here [on] July 10?" Rodriguez again denied he was in Fontana on July 10.

16

The detective next asked Rodriguez whether he "would agree" that he was "a pretty distinctive person" because he had a tattoo on his face and was five feet four inches tall. Rodriguez agreed with the detective's statements. Then, after the detective told Rodriguez that he had a video of Rodriguez at the Montclair Plaza on July 10, Rodriguez said he did not "even know" where the Montclair Plaza was, and he reiterated that he was in El Monte on July 10.

The detective then challenged Rodriguez's claim that he was in El Monte on July 10, 2017, by saying, "You weren't in El Monte. Look, somethin' bad happened that day"; then the detective asked Rodriguez whether he knew Nunez. Rodriguez initially denied that he knew Nunez. The detective challenged the denial, saying he knew that Rodriguez knew Nunez, told Rodriguez that Nunez had been arrested for murder, that the detective had spoken with Nunez, and that Rodriguez was "with" Nunez. Rodriguez said, "I was with him?" The detective said, "[On] the video, you were with him. . . . Like I said, I'm not gonna bullshit you. . . . [Nunez] gave a statement. . . . Maybe he was telling the truth, maybe he's not. All right?"

Rodriguez responded: "What? I don't know . . . . I don't even know what you guys [are talking] about right now. *I gotta call my mom about a lawyer because this is bullshit, you know?* You know, like everybody got tattoos on their face. Everybody's 5'4". I'm not the only one in the whole wide world . . . . [¶] Not everybody, but most of us. We're short. Bald." (Italics added.) The detective then asked, "Who's most of us?" and the interview continued.

17

During the rest of the interview, Rodriguez consistently denied that he was involved in any murder, including the July 10, 2017 shooting. Although he initially denied knowing Nunez, Rodriguez later said he knew someone named, "Gallo," who was "fat, sloppy," and "a retard." He did not "hang out" with Gallo but "asked him for a ride one time." After the detective said that Nunez and Gallo were the same person, Rodriguez said that Nunez had given Rodriguez a ride to go "shopping," that Rodriguez bought clothes for his birthday, and then Nunez took Rodriguez "home" to Rodriguez's aunt's house in Fontana.

The detective told Rodriguez that he had spoken to Nunez's 14-year-old son, and that he knew from talking to Nunez's son, and from several surveillance videos, that Nunez did not take Rodriguez to his aunt's house after the two of them went shopping. Instead, Rodriguez and Nunez brought food to Nunez's son at a house near the scene of the murder, and Rodriguez's fingerprints were on Corona beer bottles that Rodriguez had thrown from Nunez's car. Rodriguez denied throwing any beer bottles from Nunez's car and again denied he was involved in any murder.

Before trial, the prosecution moved to admit all of Rodriguez's custodial interview statements in its case-in-chief. Rodriguez's counsel moved to suppress the statements that Rodriguez made following his invocation of his right to counsel, after he initially waived his *Miranda* rights. The trial court denied the suppression motion on the grounds that Rodriguez initially and implicitly waived his *Miranda* rights and did not thereafter unequivocally invoke his right to counsel.

18

2. <u>Invoking the Right to Counsel After Waiving *Miranda* Rights</u>

"A defendant who has waived his *Miranda* rights may reinvoke them during the interrogation. If he clearly and unequivocally does so, police must stop questioning." (*People v. Henderson* (2020) 9 Cal.5th 1013, 1022 (*Henderson*), citing *Edwards v. Arizona* (1981) 451 U.S. 477, 478-479, 482, 485 (*Edwards*).) Any statements obtained from a defendant in violation of the defendant's *Miranda* or *Edwards* rights are inadmissible in the prosecution's case-in-chief. (*People v. Weaver* (2001) 26 Cal.4th 876, 918.)

In order to clearly and unequivocally invoke the right to counsel, a suspect " 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' " (*People v. Cunningham* (2015) 61 Cal.4th 609, 646 (*Cunningham*), quoting *Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*).) Whether a suspect has invoked his right to counsel "is an objective inquiry, identifying as ambiguous or equivocal those responses that 'a reasonable officer in light of the circumstances would have understood [to signify] only that the suspect *might* be invoking the right to counsel.' " (*People v. Williams* (2010) 49 Cal.4th 405, 428 (*Williams*), italics added, quoting *Davis*, at p. 459.) "Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda* . . . either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely* (2005) 35 Cal.4th 514, 535.)

In reviewing a trial court's denial of a motion to suppress a defendant's statements under *Miranda*, we defer to the trial court's resolution of disputed facts, including the

credibility of witnesses, if that resolution is supported by substantial evidence, and we independently determine whether the challenged statements were obtained in violation of *Miranda*. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.) But when, as here, the interview is recorded, and the facts surrounding the defendant's asserted *Miranda* or *Edwards* violation are undisputed, we review the claim de novo. (*Henderson*, *supra*, 9 Cal.5th at p. 1023.) The question is whether, " 'in light of the circumstances, a reasonable officer would have understood [the] defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel, and with no further requirement imposed upon the officers to ask clarifying questions of the defendant.' " (*Cunningham*, *supra*, 61 Cal.4th at p. 646.)

    3. Analysis

Rodriguez does not dispute that he initially waived his *Miranda* rights during his August 7, 2017 interview with, or custodial interrogation by, Detective Ferreira. He claims he subsequently and unequivocally invoked his right to counsel, and that the interview should have ceased when he said, "I gotta call my mom about a lawyer because this is bullshit."

We conclude that Rodriguez's statement about calling his mom about a lawyer was not a clear and unequivocal invocation of his right to counsel. Rodriguez made the statement *in the context* of arguing with Detective Ferreira about whether he, Rodriguez, (1) was in Fontana on July 10, 2017, and (2) was the person seen on a surveillance video with Nunez at the Montclair Plaza on July 10. A reasonable officer in Detective

Ferreira's position would have understood the statement as meaning that Rodriguez wanted to call his mother about a lawyer at some point, but not as meaning that Rodriguez did not want to answer further questions without consulting a lawyer or without having a lawyer present during the rest of the interrogation. (*Cunningham*, *supra*, 61 Cal.4th at p. 646; *Davis*, *supra*, 512 U.S. at p. 459.)

When Rodriguez made the statement, he was telling the detective that he was not in Fontana on July 10, 2017, he was not with Nunez at the Montclair Plaza on July 10, and the detective's information to the contrary was "bullshit." At no point did Rodriguez indicate to the detective that he did not want to answer any further questions without consulting a lawyer or having a lawyer present. To a reasonable officer, it appeared that Rodriguez wanted the assistance of a lawyer, at some point, to help him press his argument, but not as a condition of answering further questions.

The context in which Rodriguez made the statement is "relevant" and important. (Cf. *Henderson*, *supra*, 9 Cal.5th at pp. 1023-1024; *People v. Flores* (2020) 9 Cal.5th 371, 417 ["Whether or not a reasonable officer would perceive a suspect's statement as ambiguous may depend on context."].) "In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends." (*Williams*, *supra*, 49 Cal.4th at p. 429.) Thus, it is appropriate that we interpret Rodriguez's statement, not in isolation, but in light of the context in which the statement was made. In that context, a reasonable officer would not have understood Rodriguez's statement as an unequivocal invocation of his right to counsel.

Rodriguez's statement about calling his mother about a lawyer is similar to statements that have been held not to constitute "a clear request for counsel's assistance." (*Henderson*, *supra*, 9 Cal.5th at p. 1023 ["(See, e.g., *Davis*, *supra*, 512 U.S at p. 462 [' "Maybe I should talk to a lawyer" '] . . .)"]; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219 [" 'If you can bring me a lawyer . . . .' "]; *People v. Bacon* (2010) 50 Cal.4th 1082, 1105 [" 'I think it'd probably be a good idea for me to get an attorney.' "].) Rodriguez's statement is likewise distinguishable from statements that have been held to constitute unequivocal invocations of the right to counsel. (See, e.g., *Henderson*, at pp. 1023-1024 [" ' "[I] want to, speak to an attorney first." ' "]; *In re Art T.* (2015) 234 Cal.App.4th 335, 355-356 [" 'Could I have an attorney? Because that's not me.' "].)

As the trial court noted, and the People argue, Rodriguez's statement is more ambiguous than the statement in *People v. Roquemore* (2005) 131 Cal.App.4th 11, 19, 23-25. There the defendant, after waiving his *Miranda* rights and while speaking to an officer, said he was confused and asked, "Can I call a lawyer or my mom to talk to you?" (*Roquemore*, at pp. 19, 23-25.) The court held that the statement "did not constitute an unequivocal request for counsel to be present." (*Id.* at p. 25.) Rodriguez concedes that the statement in *Roquemore* was ambiguous because the defendant was "alternatively asking to have his mother talk to the police." He argues, however, that his statement was unequivocal because he made it "clear" that he wanted to call his mother "about a lawyer." We disagree. Rodriguez did not make it clear that he wanted to call his mother about a lawyer *before he answered any further questions*. As we have stressed,

22

Rodriguez's statement must be interpreted, not in isolation, but in the context in which it was made, and in that context, it was not a clear invocation of the right to counsel.

Rodriguez argues that his statement "is thus more analogous to the unequivocal request for counsel" in *Mays v. Clark* (9th Cir. 2015) 807 F.3d 968 (*Mays*), where the defendant told the interrogating officer that he was not the person they were looking for, and said, "My step-dad got a lawyer for me . . . can you call him and have my lawyer come down here?" (*Id*. at pp. 971-972.) The *Mays* court concluded that there was "nothing ambiguous or equivocal" about Mays's statement, which was "plainly a request for a lawyer." (*Id*. at p. 978.) The court reasoned: "A reasonable officer would have understood that Mays's father had retained a lawyer, and [that] Mays wanted the lawyer to be sent to the interrogation to represent him." (*Ibid*.)

Rodriguez claims his statement was just as unequivocal as the right-to-counsel invocation in *Mays*. He argues that, although he "asked" to call his mother rather than to call a lawyer directly, "the reason" he wanted to call his mother was so that "she could arrange for a lawyer for him." Again, however, a reasonable officer would not have understood Rodriguez's statement as an unequivocal invocation of the right to counsel. Rodriguez did not "ask" Detective Ferreira to let him call his mother about a lawyer. Rather, he said he "[needed to] call my mom about a lawyer," but he did not unequivocally indicate that he did not want to answer further questions without consulting a lawyer or having a lawyer present. In context, the statement was, at best, ambiguous and reflected more on Rodriguez's desire to combat the accusations and defend the case rather than to have counsel present prior to any questioning.

23

4. Any Error in Admitting Rodriguez's Interview Statements Was Harmless

The erroneous admission of a statement obtained in violation of a defendant's *Miranda* rights is reviewed for prejudice under *Chapman v. Cal.* (1967) 386 U.S. 18, which requires reversal unless the prosecution can show that the error was harmless beyond a reasonable doubt. (*People v. Case* (2018) 5 Cal.5th 1, 22.) "The proper test for prejudice requires consideration of not only the evidence that would support the judgment, but also the impact of the inadmissible evidence on the final outcome." (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884.) "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

Rodriguez claims that the admission of his interview statements, in which he denied having any involvement in the shooting, prejudiced his jury's guilty verdict on the first degree murder charge, because his interview statements "were inconsistent with his statements to [S.A.] about how he shot Kofu in defense of himself and/or Nunez." More specifically, he claims his interview statements were inconsistent with his defense theory—argued by his counsel during closing argument—that he either shot Kofu in self-defense or in defense of Nunez, or that he was at most guilty of voluntary manslaughter based on imperfect self-defense or defense of others. He points out that "[t]his defense theory was based on the circumstances of the shooting and on [S.A.'s] statements about what [Rodriguez] told her . . . ." But, he argues that his interview statements "severely undermined the credibility" of his defense. He argues that, had his interview statements

24

been excluded, the only statements from him that his jury would have heard would have been his statements to S.A.

We disagree that the admission of Rodriguez's interview statements could have affected the guilty verdict on the first degree murder charge for Rodriguez. To be sure, Rodriguez's interview statements, denying he had any involvement in the shooting, were inconsistent with statements to S.A. on the day of the shooting that he shot Kofu in self-defense or to defend Nunez from being beaten. S.A. told investigators that Rodriguez called her after the shooting and told her that he had " 'messed up' " and shot someone— one of "three Black guys"—after one of the three "Black" guys argued with Nunez and then "socked" Rodriguez. S.A. also told investigators that Rodriguez was not "the type" who would "let some person [(Nunez)] just get beat up."

But other, overwhelming evidence showed that Rodriguez was guilty as charged of the first degree premeditated murder of Kofu. In addition to telling investigators that Rodriguez indicated to her that he shot someone in self-defense, or to defend Nunez from being beaten, S.A. told investigators that Rodriguez had a small shotgun that he carried in a "guitar bag," and S.A. "guess[ed]" that Rodriguez used this gun to shoot and kill Kofu. The only eye-witness to the shooting, Jose V., testified that he heard Nunez arguing with Kofu, and he saw Nunez get out of his car and challenge Kofu to a fist fight, but then saw Nunez back up a few steps and heard Nunez yell at Rodriguez to get his gun "out." Rodriguez then got out of the car and shot Kofu with what looked like a sawed-off shotgun. And, before trial, Jose V. told a police detective that he heard Nunez say, " 'I

25

told you not to fuck with me.' " The 911 caller reported hearing someone say exactly the same thing after the first shot was fired, but before two more shots were fired.

Additionally, Jose V.'s and Tali's testimony completely discredited Rodriguez's statements to S.A. that "three Black guys" were arguing with Nunez and that Rodriguez shot one of the "Black" guys after he "socked" Rodriguez. Jose V. did not testify that three "Black" guys were involved in the altercation with Nunez. According to Jose V., only Kofu and Nunez were arguing, and no one "socked" Rodriguez before Rodriguez shot Kofu. Tali, who heard gunshots and ran outside of Kofu's house to help Kofu, also did not testify that anyone was with Kofu at the time of the shooting.

In light of the entire record, we are persuaded that the admission of Rodriguez's interview statements, denying any involvement in the shooting, surely did not affect the red jury's guilty verdict on the first degree murder charge for Rodriguez.

B. *Rodriguez's Claims Concerning the Expert Gang Testimony Lack Merit*

Rodriguez claims the trial court prejudicially erred in allowing the prosecution's gang expert, Detective Lopez, to testify to case-specific hearsay concerning Rodriguez's gang, EMF—namely, that EMF gang members (1) were under the control of the Mexican Mafia, which required them to be hostile to African-Americans; (2) carried baseball bats, which they called "N-word Beaters"; and (3) had previously targeted, in three specific instances, African-Americans in and outside El Monte.

Rodriguez claims (1) all of this evidence constituted inadmissible, case-specific hearsay under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*); (2) the admission of the evidence violated his federal due process right to a fair trial; and (3) the evidence

26

should have been excluded as unduly prejudicial under Evidence Code section 352. Alternatively, Rodriguez claims his counsel rendered ineffective assistance, if and to the extent that his counsel failed to preserve any of these claims of error for appeal.[9]

The People argue that Rodriguez forfeited these claims by failing to object to the admission of the evidence on the specific grounds he raises in this appeal. Alternatively, the People argue that none of the evidence amounted to case-specific hearsay because none of it concerned the "particular events and participants alleged to have been involved in the case being tried." (*Sanchez*, *supra*, 63 Cal.4th at p. 676.)

The People further argue that the evidence was more probative than prejudicial because it showed that Rodriguez had a motive for the shooting, explained why he would shoot Kofu over a minor dispute about trash or beer bottles being thrown from Nunez's car, and explained why Jose V. and S.A. were reluctant to testify against Rodriguez. Lastly, the People claim that any error in admitting the evidence was harmless.

We first summarize Detective Lopez's testimony at the Evidence Code section 402 hearing, Rodriguez's objections to the proffered testimony, the trial court's rulings on those objections, and the detective's testimony before Rodriguez's jury. We then address the parties' arguments in turn. Finding no *Sanchez*, Evidence Code section 352, or due process error, it is unnecessary to address the parties' prejudice arguments.

---

[9] Rodriguez does not claim that any of Detective Lopez's challenged testimony is based on *testimonial* hearsay. (*Crawford v. Washington* (2004) 541 U.S. 36, 60-62 (*Crawford*); see *Sanchez*, *supra*, 63 Cal.4th at pp. 679-686 [discussing treatment of testimonial hearsay when offered as basis for expert opinion testimony].)

27

1. <u>Detective Lopez's Relevant Evidence Code Section 402 Testimony</u>

Before trial, the prosecutor moved to allow "a qualified gang expert" to testify concerning the culture and habits of criminal street gangs, specifically to assist the jury in assessing the credibility of unspecified witnesses who may not want to testify or cooperate with law enforcement. Following some discussion between the court and counsel concerning the anticipated testimony of the prosecution's gang expert, the trial court said it would determine the scope of the expert's testimony at an Evidence Code section 402 hearing.

Detective Lopez later testified at an Evidence Code section 402 hearing. Because the detective had testified at defendants' preliminary hearing and had written a report summarizing his opinions, Rodriguez's counsel limited his questioning of the detective to specific areas of concern.

The detective opined that Rodriguez was an EMF gang member based on personal contacts the detective had with Rodriguez in 2009 and 2013. On those occasions, the detective was present when Rodriguez was being booked into jail and admitted he was an EMF gang member. Rodriguez also had EMF-gang-related tattoos, which only EMF gang members were permitted to have.

Based on his training and experience, and on his conversations with parole agents, the detective opined that the EMF gang, like all Southern California Hispanic gangs, was affiliated with the Mexican Mafia, a prison gang, and that all EMF gang members, including Rodriguez, were "obligated" to follow the Mexican Mafia's "code of conduct." This meant that EMF gang members were not allowed to associate with African-

28

Americans. Based on his personal contacts with EMF gang members and African-Americans who lived in El Monte, the detective opined that the EMF "hates" African-American gang members and African-American people "in general."

The detective explained that he had personally contacted EMF gang members who carried small "Dodger bats, mini bats" on which they had "etch[ed]" a racial slur—the " 'N' " word, followed by the word "beater." In addition, one African- American resident of El Monte told the detective that he was concerned for his life because, while walking his child to a local park one day, a carload of people who identified themselves as EMF gang members pulled up next to him, called him a derogatory racial slur, and told him that his "type" was not wanted in the city. They also told him he was going to get a "pass" that day because he was with his child, but if they saw him on the city streets again, they were going to shoot him on sight regardless of who he was with.

The detective also explained that he had personally investigated racial crimes in which EMF gang members had "attacked" African-American residents in El Monte, one of whom was an LAPD officer who had moved into the city in 2017. The LAPD officer was called a racial slur and told he was not to be in the city because his "type" was not allowed there. The detective had also read reports of other officers' investigations of crimes in which the EMF gang had targeted African-American gang members or individuals. Based on his training and experience, the detective opined that, as an EMF gang member, Rodriguez was "obligated" to "handle" the confrontation with Kofu in accordance with the rules of the Mexican Mafia and the EMF.

2.  <u>The Trial Court's Rulings on Rodriguez's Counsel's Objections</u>

Rodriguez's counsel objected to the detective's proposed testimony that EMF gang members, including Rodriguez, were obligated to do "whatever the Mexican Mafia wants." Counsel argued that this proposed testimony went "beyond general" background information about the customs and habits of the EMF gang, and there was no evidence that Rodriguez had personally followed the rules of the Mexican Mafia. Counsel further objected to any testimony about the Mexican Mafia on the ground it would be case-specific hearsay under *Sanchez*, testimonial hearsay under *Crawford*, and more prejudicial than probative under Evidence Code section 352. In response to counsel's objections, the prosecutor argued that the detective's proposed testimony that EMF gang members were required to follow the rules of the Mexican Mafia would not amount to case-specific hearsay under *Sanchez* because "general information about gangs is not case-specific."

The trial court agreed with the prosecutor and ruled that the detective could testify based on his training and experience, personal knowledge, and hearsay that EMF gang members were expected to comply with the rules of the Mexican Mafia. The court also ruled that the probative value of the Mexican Mafia-related testimony was not substantially outweighed by its prejudicial effect because Rodriguez's counsel could ask the detective on cross-examination whether he personally knew that Rodriguez had ever personally targeted African-Americans.

3. <u>Detective Lopez's Challenged Testimony Before Rodriguez's Jury</u>

On direct examination before Rodriguez's jury, Detective Lopez testified that he had personally contacted African-Americans who had been targeted by the EMF gang; and he had read other reports of other officers' investigations involving EMF gang members victimizing African-Americans. Based on this information, the detective opined that the EMF gang, more so than other gangs, had "a particular discontent toward" African-Americans.

The detective explained that, over the previous 13 years, he had personally contacted numerous EMF gang members who were in possession of small bats on which they had etched the " 'N' " word, followed by the word " 'Beater.' " EMF gang members had openly expressed their dislike of African-Americans and their desire to keep African-Americans out of El Monte. EMF gang members operated in the same way outside of the city, and the detective was familiar with investigations in which the EMF gang had targeted African-Americans outside of the city.

Detective Lopez briefly discussed the EMF gang's connection to the Mexican Mafia. The Mexican Mafia was a prison gang, and the EMF was a criminal street gang with its own "rules on the street," but the EMF "fe[d] into the bigger enterprise" of the Mexican Mafia and was part of its culture. African- Americans comprised less than one percent of the population of El Monte. In the detective's training and experience, gangs that were connected to the Mexican Mafia and that operated in areas where few African-Americans lived, like the El Monte, were expected to be hostile to African-Americans.

31

The detective had "no specific information," however, that Rodriguez had committed any acts of aggression against African-Americans.

The detective gave four specific examples of the EMF's custom or "pattern" of targeting African-Americans. In the first example, he had personally investigated a case in which an African-American Los Angeles Police Department (LAPD) police officer who, shortly after moving into El Monte, was approached by an EMF gang member who told him that his "type" was not wanted in the city, made racial slurs to him, and told him to leave the city. In the second example, the same LAPD officer was confronted a second time by the same EMF gang member. This time, the LAPD officer was with his wife, who was also African-American, and their child. The EMF gang member told the officer and his family that they were not allowed in the city and, with profanity, to get out of the city.

In the third example, an EMF gang member, within hours of being released from jail for serving time for grand theft auto, "went to the City of Covina where he, for no reason, solicited a young African-American male without any provocation. He attacked him with a stabbing instrument, chased him around, stabbed him a couple of times and then eventually the [victim] was able to flee . . . and seek help." This EMF gang member was convicted of assaulting the young African-American male.

In the fourth example, the detective was working on patrol in El Monte when he spoke with a young African-American male who told him that, when he was walking with his child to a local park, a "carload" of EMF gang members pulled up next to him, identified themselves, called him a racial slur, and told him he was not allowed in the

32

city. They also told him that "this time" they were giving him a pass because he was with his child, but, "If we see you here again, next time, we'll kill you on sight. You better get the hell out of the City."

4. Forfeiture

The People claim that Rodriguez forfeited his three claims of error regarding Detective Lopez's testimony because he did not object to the testimony on the grounds he now raises in this appeal. As noted, Rodriguez claims the detective's testimony that EMF gang members (1) were under the control of the Mexican Mafia, which required them to be hostile to African-Americans; (2) carried baseball bats which they called "n-beaters"; and (3) had previously targeted, in specific instances, African-Americans, constituted (1) inadmissible, case-specific hearsay under *Sanchez*, (2) should have been excluded as unduly prejudicial under Evidence Code section 352, and (3) violated his due process right to a fair trial.

As the People point out, trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 756.) Rodriguez's counsel only objected to Detective Lopez's proposed testimony that the EMF gang was required to follow the rules of the Mexican Mafia, which meant that EMF gang members had to be hostile to African-Americans.

Counsel did not object, either during the Evidence Code section 402 hearing or while Detective Lopez was testifying before Rodriguez's jury, to the detective's

testifying (1) that EMF members carried small baseball bats on which they had etched racial slurs against African-Americans, or (2) to specific examples of EMF gang members targeting African-Americans.[10]  Accordingly, Rodriguez has forfeited his claims of evidentiary error regarding the detective's testimony concerning the EMF gang's baseball bats and the specific examples in which the EMF gang had targeted African-Americans, but he has preserved his claims regarding the detective's Mexican Mafia-related testimony.

     5.  <u>Rodriguez Has Not Demonstrated Ineffective Assistance of Counsel</u>

Rodriguez claims his counsel rendered ineffective assistance of counsel in failing to preserve the forfeited claims of error for appeal.  " 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms."  [Citations.]  Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and

---

    **10**  When Detective Lopez began testifying about the specific instances in which the EMF gang targeted African-Americans, Rodriguez's counsel objected on what appeared to be relevancy grounds, saying, "This has nothing to do with Mr. Rodriguez." The objection was sustained.  After the prosecutor rephrased the question in terms of a pattern of EMF gang activity, counsel lodged the same relevancy objection, and the court overruled it.  As the People point out, a relevancy objection does not preserve a challenge under Evidence Code section 352.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1130.) Nor is a relevancy objection sufficient to preserve a hearsay claim or a due process claim for appeal.  (See *People v. Partida* (2005) 37 Cal.4th 428, 434-435 [A party cannot argue on appeal that the court erroneously failed to conduct an evidentiary analysis that the court was not asked to conduct.].)

inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)

Rodriguez has not shown that his counsel's performance was deficient for failing to preserve his claims of error regarding Detective Lopez's testimony that EMF gang members carried so called "n-beater" baseball bats and targeted African-Americans. The record indicates that Rodriguez's counsel may have had tactical reasons for not objecting to these parts of the detective's testimony. The detective was not aware, and no other evidence showed, that Rodriguez had ever carried a so-called "n-beater" baseball bat or had targeted any African-Americans. Thus, and as the People point out, counsel may have believed it would be tactically beneficial to allow Rodriguez's jury to hear that some EMF members openly expressed racial animus toward African-Americans, and carried so called "n-beater" baseball bats, so counsel could highlight the lack of evidence that Rodriguez had ever followed these practices.

35

In sum, because counsel may have had tactical reasons for not objecting to the complained of evidence, and the record does not disclose why counsel did not object, defendant has not demonstrated, on this record, that his counsel rendered ineffective assistance in failing to object.  In any event, and for the reasons we next explain, all of Rodriguez's claims about the detective's testimony lack merit.

6.  There Was No *Sanchez* Error

Rodriguez claims that Detective Lopez's testimony concerning the EMF gang's ties to the Mexican Mafia, the EMF gang's baseball bats, and the specific examples of the EMF gang's acts of targeting African-Americans was impermissibly based on case-specific hearsay under *Sanchez*.  Although we agree that much of the detective's testimony was based on hearsay, none of that hearsay was case-specific.

*Sanchez* drew a distinction between "an expert's testimony regarding his general knowledge in his field of expertise," and "*case-specific* facts about which the expert has no independent knowledge."  (*Sanchez*, *supra*, 63 Cal.4th at p. 676; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 408 (*Vega-Robles*).)  The former testimony is not barred by the hearsay rule, even if it is " 'technically hearsay,' " while the latter testimony is barred by state hearsay law, unless an exception applies.  (*Vega-Robles*, at p. 408, citing *Sanchez*, at p. 676.)  "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried."  (*Sanchez*,

36

at p. 676.)[11]

Sanchez "made [it] clear that an expert may still rely on general 'background testimony about general gang behavior or descriptions of the . . . gang's conduct and its territory,' which is relevant to the 'gang's history and general operations.' " (*People v. Meraz* (2016) 6 Cal.App.5th 1162, 1175 (*Meraz I*), quoting *Sanchez*, *supra*, 63 Cal.4th at p. 698; *Vega-Robles*, *supra*, 9 Cal.App.5th at p. 411.) Detective Lopez's opinion that EMF gang members were required to follow the rules of the Mexican Mafia, which meant that the gang had to be hostile to African-Americans and could not associate with African-Americans, was not based on case-specific hearsay. The detective's testimony about the EMF gang's ties to the Mexican Mafia had nothing to do with the "particular events and participants alleged to have been involved in the case" for which Rodriguez was being tried. (*Sanchez*, 63 Cal.4th at p. 676.)

Detective Lopez's testimony that numerous EMF gang members carried small baseball bats on which they had etched the racial slur, "n-beater," was based on the detective's personal knowledge—his numerous contacts with EMF gang members who

---

[11] As noted, Rodriguez does not claim that any of Detective Lopez's testimony was based on *testimonial* hearsay, as opposed to case-specific hearsay. Regarding *testimonial* hearsay, "the *Sanchez* court reaffirmed that '[i]f a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, . . . [a]dmission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term.' (*Sanchez, supra,* 63 Cal.4th at p. 680.) Synthesizing the high court's numerous opinions following *Crawford*, *Sanchez* defined testimonial hearsay as 'statements about a completed crime, made to an investigating officer by a nontestifying witness . . . unless they are made in the context of an ongoing emergency . . . or for some primary purpose other than preserving facts for use at trial.' (*Sanchez*, at p. 694.)" (*Vega-Robles*, *supra*, 9 Cal.App.4th at p. 409.)

were in possession of such bats. Thus, this part of the detective's testimony was not based on hearsay, much less case-specific hearsay.

In contrast, the detective did not specify the sources of his testimony that EMF gang members had openly expressed their dislike of African-Americans and their desire to keep African-Americans out of El Monte, and that the EMF gang operated in the same way outside of El Monte. None of this testimony was case-specific, however, because none of it related to the particular events and participants allegedly involved in the case being tried. (*Sanchez*, *supra*, 63 Cal.4th at p. 676.)

Lastly, the examples that the detective gave of the EMF gang targeting African-Americans—the first two involving an LAPD officer, the third involving the stabbing of a young African-American male in Covina, and the fourth involving the African-American El Monte resident who was walking with his child to a local park—were each based on hearsay, including the statements of the victims. But the examples were not based on case-specific hearsay, as none of them related to any of the events or participants alleged to be involved in the case being tried. (*Sanchez*, *supra*, 63 Cal.4th at p. 676.)

Rodriguez claims that the detective's testimony "is indistinguishable from other types of gang testimony that has been found to be case-specific, such as expert testimony relating an out-of-court statement that the expert heard from a gang member in which the member admitted his gang membership," citing *People v. Ochoa* (2017) 7 Cal.App.5th 575, at pages 588-589 (*Ochoa*), and "expert testimony relating facts about other crimes that the expert had learned about from reading the police reports," citing

*People v. Lara* (2017) 9 Cal.App.5th 296 at page 337 (*Lara*).  *Ochoa* and *Lara* are inapposite.

In *Ochoa*, a gang expert testified based on hearsay that at least 12 individuals, who were not involved in the crimes for which the defendant was on trial, were the defendant's fellow gang members.  (*Ochoa*, *supra*, 7 Cal.App.5th at pp. 582-583.)  It was unclear from the record in *Ochoa* whether the hearsay was testimonial (*id*. at pp. 584-586); but *Ochoa* concluded that the hearsay was case-specific because it was relevant to whether prior offenses committed by some of the same individuals qualified as predicate offenses, and thus whether gang enhancement allegations on two of the charges against the defendant on trial were true.  (*Id*. at pp. 578, 582-583, 588-589 & fn. 6.)

In *Lara*, a gang expert testified, based on testimonial hearsay in police reports of investigations of completed crimes, that the three defendants on trial had been contacted in the company of gang members.  (*Lara*, *supra*, 9 Cal.App.5th at p. 337.)  The testimonial hearsay established a necessary predicate offense against one of the defendants and was relevant to whether all three of the defendants were guilty of an active gang participation charge and whether gang enhancement allegations on another charge were true.  (*Id*. at pp. 327-329, 337.)

There is currently a split of authority on whether gang expert testimony about predicate offenses constitutes "case-specific" information under *Sanchez*, and *Ochoa* and *Lara* are on one side of this split.  (Compare *Menifee v. Superior Court* (2020) 57 Cal.App.5th 343, 365; *People v. Thompkins* (2020) 50 Cal.App.5th 365, 411; *Lara*, *supra*, 9 Cal.App.5th at p. 337; and *Ochoa*, *supra*, 7 Cal.App.5th at pp. 583, 588-589

with *People v. Bermudez* (2020) 45 Cal.App.5th 358, 377 & fn. 13; *People v. Blessett* (2018) 22 Cal.App.5th 903, 944-945 & fn. 21, disapproved on another ground in *People v. Perez* (2020) 9 Cal.5th 1, 14; *Vega-Robles*, *supra*, 9 Cal.App.5th at p. 411, and *Meraz I*, *supra*, 6 Cal.App.5th at p. 1175.)

In this case, it is unnecessary to weigh-in on this split of authority because Rodriguez does not challenge the detective's testimony about the EMF gang's predicate offenses on any ground, including as being impermissibly based on case-specific hearsay. *Ochoa* and *Lara* are distinguishable because they did not involve claims like Rodriguez's—namely, that a gang expert's testimony about the customs and habits of a gang are based on case-specific hearsay.

Rodriguez further argues that Detective Lopez's testimony "[did] not qualify as the type of background information that an expert is still allowed to relate to the jury under *Sanchez*." Instead, he argues, the detective's testimony "went beyond discussing generic background information, and instead testified about *specific statements* from members of [Rodriguez's] gang about how they are hostile to African- Americans, and *specific incidents* the [detective] had heard about in which African- Americans had been targeted by members of [Rodriguez's] gang." He asserts that "[t]his type of testimony is indistinguishable" from the examples of case-specific facts given in *Sanchez*. We disagree.

As we have stressed, facts are only case-specific under *Sanchez* when, in the words of *Sanchez*, "they relate '*to the particular events and participants* alleged to have been involved in the case being tried.' " (*People v. Meraz* (2018) 30 Cal.App.5th 768,

40

781 (*Meraz II*); *Sanchez*, *supra*, 63 Cal.4th at p. 676.) All of the examples of the case-specific facts given in *Sanchez* met this standard. (*Sanchez*, at p. 677 [noting, e.g., "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact . . . ."].) But none of Detective Lopez's testimony was based on case-specific hearsay, or case-specific facts of which the detective had no personal knowledge.

Further, *Sanchez* clarified "that an expert may still rely on general 'background testimony about general gang behavior or descriptions of the . . . gang's conduct and its territory,' which is relevant to the 'gang's history and general operations.' " (*Meraz II*, *supra*, 30 Cal.App.4th at p. 781; *Sanchez*, *supra*, 63 Cal.4th at p. 698.) *Sanchez* also clarified that an expert, in supporting his opinion, "is entitled to explain to the jury the 'matter' upon which [the expert] relied, even if that matter would ordinarily be inadmissible." (*Sanchez*, at pp. 678-679; Evid. Code, § 802.)[12]

All of Detective Lopez's challenged testimony about the EMF gang, including that its members are required to follow the Mexican Mafia's policy of being hostile to African-Americans, that the gang has a custom and practice of targeting African-Americans, and the specific examples of the gang's acts of targeting African-Americans, both in and outside El Monte, constituted background information about the gang, its general behavior, descriptions of its conduct, and its territory. (*Sanchez*, *supra*, 63

_____

[12] There are, however, limits to the hearsay that an expert may relay to a jury in explaining the basis of the expert's opinion. As noted in *Sanchez*, Evidence Code section 352 authorizes trial courts " 'to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.' " (*Sanchez*, *supra*, 63 Cal.4th at p. 679.) We discuss this exception *post*, in connection with Rodriguez's section 352 and due process claims.

Cal.4th at pp. 678-679, 698.)  In sum, none of the detective's challenged testimony was based on case-specific hearsay, as *Sanchez* defines the term.  (*Id*. at p. 676.)

    7.  There Was No Evidence Code Section 352 or Due Process Error

Rodriguez next claims that Detective Lopez's testimony about the EMF gang's custom and practice of following the Mexican Mafia's edict of being hostile to African-Americans, and his testimony about the specific examples of EMF gang members targeting and making racist statements to African-Americans, had no "legitimate" probative value, was unduly prejudicial, and should have been excluded under Evidence Code section 352.  He also claims that this testimony was so inflammatory and prejudicial that its admission violated his due process right to a fair trial.  We find no merit to these claims.

We begin with Evidence Code section 352,[13] which "requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect.  'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People. v. Tran* (2011) 51 Cal.4th 1040, 1047.)

As the trial court ruled, the detective's Mexican Mafia-related testimony was probative because it showed that Rodriguez had a motive to shoot and kill Kofu.  As an

___

[13] Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

EMF gang member, Rodriguez was required to follow the Mexican Mafia's edict of being hostile to African-Americans. The detective's testimony about the specific examples of the EMF gang targeting and making racist statements to African-Americans, both inside and outside El Monte, and the detective's additional testimony that numerous members of the EMF gang carried baseball bats they called "n-beaters," was also probative. It showed that the EMF gang had a particular custom and habit of being hostile to African-Americans and of targeting African-Americans without provocation, both inside and outside of El Monte.

Rodriguez argues that all of this evidence had no "legitimate probative value" because, without it, the prosecution had sufficient evidence to argue that the shooting of Kofu was gang related for purposes of the gang enhancement. He points out that his membership in the EMF gang and the gang's status as a criminal street gang were "basically undisputed," and his jury heard testimony from Tali that Kofu was a member of an African-American gang. He also argues that, although the prosecution's theory that the shooting was gang-motivated required "some expert testimony" that the EMF gang "ha[d] a habit of being hostile toward African-American gangs," the detective "opined about this fact in general terms," and that should have been sufficient. He further argues that the evidence posed "an extreme risk" of undue prejudice because it "consisted of exceptionally inflammatory references to the Mexican Mafia and weapons called N-word beaters," together with specific examines of "unprovoked" threats and attacks by EMF gang members on "African-American men and their families," all of which had nothing to do with the charged shooting of Kofu.

We disagree with Rodriguez's Evidence Code section 352 analysis. The probative value of the detective's testimony was not substantially outweighed by its prejudicial effect. As noted, the evidence showed that Rodriguez had a motive for shooting and killing Kofu. Without the evidence, the jury likely would have wondered why Rodriguez would shoot Kofu three times over a minor argument between Nunez and Kofu over beer bottles being thrown from Nunez's car. Standing alone, the detective's general testimony that the EMF gang, more so than other gangs, had conflicts with African- Americans, would not have sufficiently informed Rodriguez's jury that Rodriguez had a particular motive for shooting and killing Kofu—that is, adhering to the rules, customs, and habits of the Mexican Mafia and the EMF gang.

Nor was any the detective's testimony unduly prejudicial in the sense that it would have evoked an emotional bias against Rodriguez as an individual or would have caused the jury to prejudge him based on extraneous factors. (*People v. Cowan* (2010) 50 Cal.4th 401, 475.) "[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009.)

Contrary to Rodriguez's claim, the detective's Mexican Mafia-related testimony was brief and not inflammatory. It was limited to explaining that the EMF gang had its own "rules on the street" but "fe[d] into the bigger enterprise" of the Mexican Mafia, a

44

prison gang; the EMF gang was part of the Mexican Mafia's culture; and gangs, like the EMF gang, that were connected to the Mexican Mafia and that operated in areas where few African-Americans lived were expected to be hostile to African-Americans. The detective also admitted he had "no specific information" that Rodriguez had committed any acts of aggression against African- Americans. As the trial court ruled, this admission mitigated any prejudicial effect that the detective's Mexican Mafia-related testimony may have had.

Additionally, although the court was not called upon to rule on the question, the admission likewise mitigated any prejudicial effect of the detective's testimony about the EMF gang targeting African-Americans, making racist statements to African-Americans, and carrying baseball bats that the gang called "n-beaters." The jury also heard no evidence that Rodriguez had ever carried such a bat and was instructed not to use any of the gang evidence to conclude that Rodriguez was a person of bad character or had a disposition to commit crime. (CALCRIM No. 1403.)

The detective's challenged testimony also did not violate Rodriguez's due process right to a fair trial. In support of this claim, Rodriguez relies on *People v. Albarran* (2007) 149 Cal.App.4th 214, which involved the admission of extensive, irrelevant, and inflammatory gang evidence that the jury could have used for an improper purpose. (*Id*. at p. 229.) The *Albarran* jury could have used the evidence to conclude that, even if the defendant was not involved in the charged shootings, he had committed other crimes, would commit crimes in the future, posed a danger to society, and should be punished. (*Id*. at pp. 229-230.) In contrast here, Detective Lopez's testimony was highly probative

45

of whether Rodriguez had a motive to shoot and kill Kofu. In sum, the challenged testimony was not extensive, irrelevant, or inflammatory, and posed no risk of undue prejudice to Rodriguez.

## C. *Kofu's Prior Robbery Conviction Was Properly Excluded (Evid. Code, § 1103)*

Several times during trial, the court and counsel discussed whether either defendant wanted the court to admit evidence that Kofu had a prior second degree robbery conviction for the purpose of showing that Kofu had a violent character and acted in conformity with that character at the time of the shooting. (Evid. Code, § 1103.) Ultimately, Rodriguez's counsel asked the court to take judicial notice of Kofu's prior robbery conviction, but the court excluded the evidence on relevance grounds.

In excluding the evidence, the court noted that it had no information about the facts underlying the robbery in order to determine its relevance. The prosecutor recalled from Kofu's rap sheet that the robbery occurred in Los Angeles County in 2014 or 2015, but neither the prosecutor nor either defense counsel had any information about the facts underlying the robbery.

The court reasoned that the mere fact that Kofu had a prior robbery conviction did not support a reasonable inference that he acted with force or had the propensity to be violent at the time of the shooting. The court also noted that there was other evidence that the defense could use to show that Kofu acted aggressively at the time of the shooting: Tali testified that Kofu was angry at the time of the shooting because he had just had a "major argument" with his mother, and that Kofu tended to act aggressively

46

when he had controlled substances in his system, which, according to his autopsy, he had at the time of the shooting.

Rodriguez claims the court erred under state law and violated his due process right to present a defense in excluding the evidence that Kofu had a prior conviction for second degree robbery. He claims the bare fact of the conviction was "relevant and material to the defense theory of self-defense/defense of others by showing that Kofu was acting in conformity with his character for violence." (Evid. Code, § 1103.) He claims the error requires reversal of his murder conviction, "since there is at least a reasonable chance that at least some jurors would have given [him] the benefit of the doubt as to whether he was acting in perfect or imperfect self-defense/defense of others if this evidence had properly been admitted." We disagree.

"Evidence Code section 1103 authorizes the defense in a criminal case to offer evidence of the victim's character to prove his conduct at the time of the charged crime. Consequently, in a prosecution for a homicide or an assaultive crime where self-defense is raised, evidence *of the violent character* of the victim is admissible to show that the victim was the aggressor." (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446, fns. omitted, italics added.) The defense may prove that the victim had an aggressive and violent character through the victim's *specific acts* on third persons. (*Id*. at p. 447.) "Robbery is a crime of violence committed against a person." (*People v. Scott* (2009) 45 Cal.4th 743, 749.)

We review a trial court's exclusion of evidence on relevance grounds for an abuse of discretion. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 828 (*Gutierrez*).) "The trial

47

court must always perform its gatekeeping function pursuant to Evidence Code section 350 to exclude evidence that is irrelevant." (*Id*. at p. 828.) Here, we find no abuse of discretion in the court's exclusion of the evidence that Kofu had a prior conviction for second degree robbery. As the trial court ruled, the bare fact of the conviction did not support a reasonable inference that Kofu had a character or propensity for violence and acted in conformity with that character at the time of the shooting.

As the court indicated, it could not be inferred from the fact of the conviction that Kofu perpetrated any acts of violence or aggression in committing the robbery. (See §§ 211, 212.5.) For all the court knew, Kofu could have committed the robbery by politely asking his victim to hand over money or property, with an implicit threat of force, but without any acts of aggression or violence.

Rodriguez claims the court excluded the evidence of the conviction under Evidence Code section 352, and that a court's discretion to exclude *relevant defense evidence* is limited under that statute. To be sure, "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense." (*People v. Reeder* (1978) 82 Cal.App.3d 543, 552.) But it is clear that the court excluded the evidence of the conviction solely on relevance grounds (Evid. Code, §§ 210, 350) and not because its admission would have consumed undue time, created a substantial risk of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.)

Moreover, the bare fact of the conviction did not have substantial probative value to the defense. Rodriguez maintains that "the jurors could not fairly evaluate" his claim

48

that he shot Kofu in self-defense or in defense of Nunez without hearing that Kofu had a prior conviction for second degree robbery. He claims that the fact of the conviction showed that Kofu had "a violent past," and that the conviction accordingly had "substantial probative value" to the defense.

Again, however, the bare fact of the conviction did not support a reasonable inference that Kofu had a character or propensity for violence and acted in conformity with that character at the time of the shooting. (Evid. Code, § 1103.) A person may be convicted of robbery even if they committed no acts of force or violence. For example, "a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during [the asportation element of the robbery], may properly be found liable as an aider and abettor of the robbery." (*People v. Cooper* (1991) 53Cal.3d 1158, 1161.) Because the fact of the conviction in the instant case did not support the inference that Kofu had a character or propensity for violence, the fact of the conviction did not have substantial probative value to the defense, and its exclusion was neither an abuse of the court's discretion nor a violation of Rodriguez's due process right to a fair trial. (*People v. Mincey* (1992) 2 Cal.4th 408, 442 ["A defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference."].)

Any error in excluding the fact of the prior robbery conviction was also harmless. The erroneous failure to admit evidence that a victim was the initial aggressor (Evid.

Code, § 1103, subd. (a)(1)) is reviewed for prejudice under the *Watson*[14] standard. (*Gutierrez*, *supra*, 45 Cal.4th at pp. 827-828.)  Under that standard, there is no reasonable probability that Rodriguez would have realized a more favorable result had he been permitted to introduce the evidence that Kofu had a prior robbery conviction.

Ample other evidence indicated to the jury that Kofu acted aggressively at the time of the shooting.  Tali testified that Kofu was "mad a lot" and did not " 'take any shit.' "  Kofu would stand in front of his house and, when he felt someone was " 'mugging' " him, that is, looking angrily at him, he would respond in kind.  When he did drugs, he would "get angry easier," and his autopsy showed that he had methamphetamine in his system at the time of his death, shortly after the shooting.  At the time of the shooting, he was "very mad" and "upset" because he had had an argument with his mother earlier that morning.  The court did not abuse its discretion in concluding that the fact of Kofu's prior robbery conviction would have added nothing of probative value to this evidence, or to Rodriguez's claim that he shot Kofu in self-defense or in defense of Nunez.  Instead, it would have allowed the jury to speculate that Kofu acted violently during the prior robbery—inferences that the conviction itself did not support.

D.  *The 911 Caller's Hearsay Statements Were Properly Admitted Before Both Juries*

Rodriguez and Nunez both claim that the trial court prejudicially erred in admitting the hearsay statements that the anonymous 911 caller reported hearing at the

---

[14]  *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

50

time of the shooting: " 'No, no, I'm sorry, I'm sorry,' " and " 'I told you not to fuck with me.' " We find no merit to this claim.

1. Background

Before trial, the 911 caller had not been located, so the prosecutor sought to admit the recording of the 911 call through the 911 dispatcher, whom the prosecutor said could lay the foundation for the admission of the hearsay statements in the 911 call as spontaneous statements of the 911 caller. (Evid. Code, § 1240.) The court ruled that the statements were admissible on that ground.

A recording of the 911 call was played for both juries. The 911 caller reported that, around three minutes earlier, he/she heard a gunshot, followed by someone saying, " 'No, no, I'm sorry, I'm sorry,' " followed by another person saying, " 'I told you not to fuck with me,' " followed by at least two more gunshots.

Jose V. and Tali testified before both juries and described what they heard and saw at the time of and after the shooting. Detective Ferreira testified before both juries that, before trial, Jose V. told him that he, Jose V., heard Nunez say, " 'I told you not to fuck with me.' "

The prosecution's gang expert, Detective Lopez, was asked on direct examination "[w]hat, if anything," he could say about the "exchange" reported in the 911 call, "as it relate[d] to how the reputation" of the EMF gang could benefit "from that incident happening that way." Nunez's counsel objected that the question called for speculation, but the court overruled the objection.

51

Detective Lopez then testified that, in his opinion, the fact that one shot was fired, that the victim then apologized, but that "somebody in the group" then said, " 'You should have never fucked with me,' " before two more shots were fired, showed "how violent and dangerous that gang member is." The gang member was also showing "dominance" by shooting Kofu again after Kofu apologized.

During closing argument before Nunez's jury, the prosecutor played the 911 recording again, and attributed the, " 'I'm sorry,' " statement to Kofu, and the, " 'I told you not to fuck with me,' " statement to either Nunez or Rodriguez. The prosecutor then argued that the statements showed that both defendants, Nunez and Rodriguez, intended to commit first degree premeditated murder.

During closing argument before Rodriguez's jury, the prosecutor argued that "what you heard on that 911 call" corroborated the pathologist's testimony that the trajectory of two of Kofu's three bullet wounds showed that two of the wounds were inflicted when Kofu was on the ground, and that these two "extra shots were an ambush."

The prosecutor then played the 911 recording before Rodriguez's jury, and argued that the 911 call put the two extra shots "into context" and corroborated Tali's testimony that he heard one shot, then a pause, followed by two more shots. The prosecutor then argued that Rodriguez was the shooter, and that the comment, " 'I told you not to fuck with me,' " showed "how gang members handle situations," regardless of whether Nunez or Rodriguez made the statement. The prosecutor then argued, "That's why your verdict [for Rodriguez] is first degree murder."

2.  Analysis

Evidence Code section 1240 sets forth the spontaneous statement exception to the hearsay rule.  It provides:  "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

Defendants concede that the 911 call was made within minutes of the shooting, under the stress of the excitement caused by it.  They argue, however, that the court erred in admitting the 911 caller's hearsay statements as spontaneous statements, without establishing the "preliminary fact" of who made each statement.  (Evid. Code, § 403, subd. (a)(4).)  They argue that the *relevancy* of the two statements, "No, no, I'm sorry . . . ," and "I told you not to fuck with me," depended on who made each statement, and the court did not make that determination.

Defendants further argue that the admission of the two statements deprived them of their due process right to a fair trial because the prosecution used the statements to undermine their defense that the shooting was justified because Rodriguez shot Kofu in self-defense or in defense of Nunez.  They claim that the prosecution and its gang expert, Detective Lopez, were erroneously allowed to *assume or speculate* that Kofu made the first statement, and that either Nunez or Rodriguez made the second statement, and on that basis opine and argue, respectively, that the shooting benefited the EMF gang and was first degree murder.  They maintain that both statements were irrelevant and inadmissible because there was no showing of who made each statement.

53

To be sure, the relevance of evidence sometimes depends on the existence of a preliminary fact. (Evid. Code, § 403, subd. (a); *People v. Lucas* (1995) 12 Cal.4th 415, 466 (*Lucas*), citing *People v. Collins* (1975) 44 Cal.App.3d 617 ["identity of person who made threatening telephone call to witness is preliminary fact [the] proponent of proffered testimony has burden of establishing before fact of telephone call is relevant"].) But, "[t]he court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury,' " and "[t]he decision whether the foundational evidence is sufficiently substantial" to allow the jury to make this determination is "a matter within the court's discretion." (*Lucas*, at p. 466.)

In ruling that the two hearsay statements that the 911 caller reported hearing at the time of the shooting were admissible as the caller's spontaneous statements (Evid. Code, § 1240), the court did not expressly determine that the prosecution made a sufficient foundational showing of the preliminary fact of who made each statement. (Evid. Code, § 403, subd. (a)(4).) But the prosecution's proffered evidence, and the evidence that the prosecution later presented to both juries, was sufficient to allow each jury to determine that Kofu was the person who said, "No, no, I'm sorry, I'm sorry," and that either Nunez or Rodriguez said, "I told you not to fuck with me."

Jose V. testified that he was driving past Kofu's house, and he drove between Kofu and Nunez's car when he heard Nunez and Kofu arguing, saw them put their fists up, and walk toward each other before Nunez yelled to Rodriguez to " 'Get it out.' " Jose V. then saw Rodriguez get out of Nunez's car with a shotgun and shoot Kofu once before

54

Jose V. drove away. Detective Ferreira later testified that, before trial, Jose V. told the detective that he, Jose V., heard Nunez say, " 'I told you not to fuck with me.' " Tali testified that he was inside Kofu's house and that Kofu was outside when he heard one gunshot, followed by a pause, then two more gunshots, before Kofu began calling to Tali to help him.

All of this evidence allowed each defendant's jury to reasonably determine that Kofu was the person who said, "No, no, I'm sorry . . . ," after he was shot the first time, and that Nunez was the person who said, "I told you not to fuck with me." Thus, the potential relevancy of the two statements was established. (Evid. Code, § 403, subd. (a)(4); *Lucas*, *supra*, 12 Cal.4th at pp. 466-467 [questions of preliminary facts are ultimately decided by the jury; the court's function is to determine whether there is sufficient evidence to allow the jury to decide the preliminary fact in the proponent's favor].) Thus, neither Detective Lopez's opinion nor the prosecutor's argument that the shooting benefited the EMF gang, and was first degree murder, were based on speculation as to who made which statement.

E. *The Prosecutor Did Not Misstate the Law of Premeditation and Deliberation During Closing Argument Before Rodriguez's Jury*

Rodriguez claims the prosecutor gave misleading examples of premeditation and deliberation during closing argument that amounted to prosecutorial error under state and federal law. In arguing that Rodriguez was guilty of first degree premeditated murder, the prosecutor compared premeditation and deliberation to decisions to drive through a yellow traffic light and to swat a mosquito. We conclude that there is no reasonable

55

likelihood that Rodriguez's jury construed the prosecutor's comparisons in an objectionable fashion. Thus, there was no prosecutorial error.

1. Background

In closing argument before Rodriguez's jury, the prosecutor discussed the requirements of premeditation and deliberation for purposes of first degree murder. He argued that Rodriguez acted with premeditation when he shot and killed Kofu, in part because Kofu was lying on the ground, defenseless, and with one bullet wound in his leg, when Rodriguez shot him two more times. He noted that, "[a] decision to kill rashly, impulsively, without careful consideration is not deliberate, premeditated. On the other hand, a cold, calculated decision to kill [can] be reached quickly. The test is the extent of the reflection; not the length of time." (See CALCRIM No. 521 (first degree murder).)

The prosecutor then gave two hypothetical examples—the decision to run a yellow traffic light and to swat a mosquito—to illustrate deliberation and premeditation: "So here's an example [that] we use in the courts. And it makes a lot of sense, right? Deliberation and premeditation, concept[s] that you—words we don't always use. You're supposed to be here at 9:30 this morning and maybe you had a little bit late start to your day, whatever it is that got you a little bit off track on the time. You get on, let's say, the 210 Freeway. Your exit is on Haven. You're looking at the time. It's 9:15. You're thinking, 'Jeez. Sometimes the elevators work; sometimes they don't. I know what parking's like. I know what it takes to get into that courthouse. I better start going a little faster.' So you start getting faster. You're getting closer to Foothill Boulevard.

You're going South. You're driving. 'Awesome. I'm going to get right through there. I'm going to make it.' And the light turns yellow. What do you do?"

At this point, Rodriguez's counsel objected to the argument as "improper," and the objection was overruled. The prosecutor continued: "If you're anything like that, you start looking around. Maybe you look in the rearview mirror to see is there a car behind you. If you might hit the brakes really hard. Maybe you look at cross traffic to see if any cars are coming fast [that are] going to hit you. If I go through this light when it might turn red. Maybe you kind of glance forward at the Rancho Cucamonga Station down there. 'Am I going to get a ticket if I go through this light?' . . .

"In your mind you're thinking, 'I don't want to be the juror that's late. We're supposed to start on time.' All the thoughts go through your mind. You determine hit the gas or hit the brakes. What are you doing there? You're exercising deliberation and premeditation. It can be that quick. It's not a long, drawn out process. You're reflecting on the consequences of your actions and you're making a choice. That's deliberation and premeditation. [¶] Another example—it's not one that—probably not as good as the first one—but you got a mosquito on your arm, and you have to determine, 'Am I going to show [*sic*] it or swat it?' You might think, 'You know, what am I wearing? Who's around? Is anyone going to see me do this?' That might impact your decision, but you're going to make that decision. That thought process goes through your mind. That's deliberation."

2. <u>Analysis</u>

Claims of prosecutorial error are evaluated under the following standards: "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

In the context of first degree murder, premeditated means considered beforehand, and deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*).) "Premeditation and deliberation require 'substantially more reflection; i.e., more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intent to kill.' " (*People. v. Van Ronk* (1985) 171 Cal.App.3d 818, 823.) But the process of premeditation and deliberation does not require any extended period of time. (*Lee*, at p. 636.) " ' "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." ' " (*Ibid.*) A "preexisting reflection, of any

58

duration," distinguishes first degree premeditated and deliberate murder from second degree murder. *(People v. Solomon* (2010) 49 Cal.4th 792, 813; *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1264-1265 (*Boatman*).)

The question here is whether there is a reasonable likelihood that Rodriguez's jury construed the prosecutor's examples of a person deciding to run a yellow traffic light, and to swat a mosquito, in an objectionable fashion, that is, as misleading examples of acting with premeditation and deliberation. We conclude there was no such reasonable likelihood because the examples were not misleading, either on their face or in the context of the entire record, including the instructions on first degree murder.

The jury was properly instructed on the meanings of premeditation and deliberation pursuant to CALCRIM No. 521. The prosecutor's examples of a person deciding to run a yellow traffic light, and to swat a mosquito, illustrated that those decisions would be made (1) with premeditation, if the person considered the decisions before making them; and (2) with deliberation, if the person made the decisions after thinking about and weighing the considerations for and against the decisions. In keeping with the legal definitions of premeditation and deliberation (CALCRIM No. 521), the prosecutor emphasized that the test of premeditation and deliberation was not determined by the amount of time that the person took to make the decisions, but whether the person made the decisions following *any* period of reflection. Thus, the argument was proper.

Rodriguez claims that this court's decision in *Boatman* shows that the prosecutor's comparisons to the decisions to run a yellow traffic light and to swat a mosquito misstated the meanings of premeditation and deliberation. The defendant in *Boatman*

59

was convicted of first degree willful, deliberate, and premeditated murder for shooting his girlfriend in her face. (*Boatman*, *supra*, 221 Cal.App.4th at pp. 1257-1258.) Before trial, he gave conflicting accounts of how the shooting occurred but testified at trial that the gun accidentally went off. (*Id*. at pp. 1259-1260.) This court concluded that the evidence was sufficient to support a finding of express malice, that is, that the defendant intentionally shot and killed his girlfriend, but was insufficient to support the jury's finding that the defendant acted with premeditation and deliberation. (*Id*. at pp. 1257, 1274.)

This court explained that the *Boatman* defendant's first degree murder conviction required evidence that "the gunshot to the face was pursuant to a ' "preconceived design" to take his victim's life . . . .' " (*Boatman*, *supra*, 221 Cal.App.4th at p. 1268.) The evidence that the defendant "took the time to pull back the hammer, point the pistol at [the victim's] face, and fire the weapon," was insufficient to show that he acted with premeditation and deliberation when he shot his girlfriend. (*Id*. at p. 1273.) We reasoned that "cocking, aiming, and firing a revolver essentially describes the act of shooting with a revolver. If these actions could, without more, constitute premeditation and deliberation, we would effectively add killing perpetrated by a revolver to the list of crimes specifically enumerated in section 189 and thereby substantially broaden the scope of first degree murder . . . ." (*Id*. at p. 1274, fn. 4.)

Rodriguez compares the act of cocking, aiming, and firing a revolver, without more, to the prosecutor's examples of deciding to run a yellow traffic light and to swat a mosquito. He suggests that such acts are never premeditated and deliberate but are

60

always impulsive and unconsidered. But this argument disregards critical details in the prosecutor's yellow traffic light and mosquito swatting examples; in both examples, before acting, the person considered all of the consequences of running the yellow light and of swatting the mosquito. The point of the examples was to illustrate that a premeditated and deliberate decision can be made quickly. Again, the argument was proper.

Rodriguez observes that in *People v. Avila* (2009) 46 Cal.4th 680 (*Avila*), our Supreme Court "acknowledged that it would be improper to argue" that " 'the "cold, calculated" judgment of murder is the equivalent of deciding whether to stop at a yellow light or proceed through the intersection.' " (*Id.* at p. 715.) He claims that the members of his jury "likely recognized" from their own personal experiences that "a yellow traffic light lasts between three and six seconds," and that "the act of swatting a mosquito is reflexive and happens almost instinctively the instant the mosquito is noticed."

But, as noted in *Avila*, the prosecutor there did not argue that the mental processes of premeditation and deliberation were "equivalent" to deciding whether to run a yellow traffic light. (*Avila*, *supra*, 46 Cal.4th at p. 715.) To the contrary, the prosecutor in *Avila* expressly acknowledged that, "[d]eciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here." (*Ibid.*) Similarly here, the prosecutor did not trivialize the process of making a premeditated and deliberate decision to kill by comparing it to the decision to run a yellow traffic light or to swat a mosquito. As noted, the prosecutor merely used the examples to illustrate how the process of premeditation

61

and deliberation can occur quickly. His examples showed that a premeditated and deliberate decision to kill must be made " ' "as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*Boatman*, *supra*, 221 Cal.App.4th at p. 1264, quoting *People v. Pearson* (2013) 56 Cal.4th 393, 443.) Thus, the prosecutor's argument was not error under state or federal law.

F. *Rodriguez's Hearsay Statements to S.A Were Properly Admitted Against Nunez As Declarations Against Rodriguez's Penal Interest* (*Evid. Code*, § *1230*)

During her police interview with Detective Ferreira, S.A. said that Rodriguez told S.A. that: (1) there were three "Black guys" on the street; (2) Nunez was arguing with one of them; (3) Nunez had prior "drama" and "a beef" with them; (4) Nunez had been "trying to fight them"; and (5) Nunez started the altercation. S.A. also told Detective Ferreira that Rodriguez told her that Rodriguez told Nunez to get back into the car, but Nunez would not listen to him, so Rodriguez also got out of the car and shot one of the three men (in self-defense) after the man "socked" Rodriguez. All of these statements were admitted against Nunez as statements against Rodriguez's penal interest. (Evid.

Code, § 1230.)[15]

Nunez claims the court abused its discretion and violated his due process right to a fair trial in admitting three of Rodriguez's hearsay statements to S.A—the ones we have denominated *ante* as statements (3), (4) and (5)—that Nunez had been trying to fight with the three "Black" guys, that Nunez had prior " 'drama' " and a prior " 'beef' " with them, and that Nunez started the altercation with the "Black" guys, or one of them, that culminated in Rodriguez shooting one of the "Black" guys.

Nunez argues that the statements did not qualify as statements against Rodriguez's penal interest because they were "highly incriminating" of Nunez and "minimizing and exculpatory" of Rodriguez's penal interest. He claims the statements "sought to shift blame and finger" him "as more culpable for the crime" than Rodriguez. We find no merit to these claims and conclude that the court did not abuse its discretion in admitting the hearsay statements against Nunez as declarations against Rodriguez's penal interest. (Evid. Code, § 1230.)

---

[15] Before trial, the prosecutor moved to admit S.A.'s interview statements in which she reported the hearsay statements made to her by Rodriguez, which incriminated both Rodriguez and Nunez. The prosecutor argued that Rodriguez's hearsay statements to S.A. were admissible against Nunez because the statements were (1) nontestimonial, and thus did not implicate Nunez's confrontation rights, (2) qualified under the hearsay exception for declarations against Rodriguez's penal interest (Evid. Code, § 1230), and (3) were trustworthy and reliable. Nunez's counsel objected to the admission of the statements on the ground they implicated Nunez as the aggressor in the confrontation with Kofu. The court ruled that the statements were nontestimonial, trustworthy, and reliable, and thus admissible against Nunez as declarations against Rodriguez's penal interest.

63

The applicable legal principles and our standard of review are summarily stated in *People v. Grimes* (2016) 1 Cal.5th 698 at pages 710 to 711 (*Grimes*): "Although hearsay statements are generally inadmissible under California law (Evid. Code, § 1200, subd. (b)), the rule has a number of exceptions. One such exception permits the admission of any statement that 'when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true.' (Evid. Code, § 1230.) As applied to statements against the declarant's penal interest, in particular, the rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements. [Citation.]

"[¶] To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the

64

declarant's relationship to the defendant.' [Citation.] [¶] We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion." (*Grimes*, *supra*, 1 Cal.5th at pp. 710-711.)

Nunez correctly points out that the declaration against interest exception (Evid. Code § 1230) "generally does not extend to remarks that seek to shift or assign greater blame to others, minimize, or curry favor—even when made as part of a broader inculpatory statement." (See, e.g., *People v. Duarte* (2000) 24 Cal.4th 603, 614-617 and *People v. Gallardo* (2017) 18 Cal.App.5th 51, 71, 75.) He also correctly points out that in *People v. Leach* (1975) 15 Cal.3d 419, our Supreme Court "construe[d] the exception . . . to be inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*Id*. at p. 441.) But more recently, in *Grimes,* our Supreme Court clarified that the exception extends to statements "that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.' " (*Grimes*, *supra*, 1 Cal.5th at p. 715, quoting *People v. Samuels* (2005) 36 Cal.4th 96, 120-121.) That is the case here.

*Grimes* also noted that cases construing and applying an analogous exception to the federal hearsay rule, and California cases construing and applying Evidence Code section 1230, had taken "a contextual approach" in applying the exceptions and "the *Leach* rule." (*Grimes*, *supra*, 1 Cal.5th at pp. 713-715.) *Grimes* concluded that "the nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further

incriminate' the declarant. Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.' " (*Grimes*, at p. 716.)

Here, the trial court did not abuse its discretion in concluding that Rodriguez's challenged hearsay statements were admissible against Nunez as declarations against Rodriguez's penal interest. We begin with Rodriguez's core inculpatory statement: his confession to S.A. that he shot someone. By all accounts, there was only one shooter in this case. Thus, the inculpatory nature of the statement cannot be overstated. Rodriguez directly inculpated himself in the shooting when he told S.A. that he shot a man after the man "socked" him. Although the details of Rodriguez's confession to S.A. indicated that he shot the man in self-defense or in defense of Nunez, the trial court could have reasonably concluded that the entire confession was nonetheless disserving of Rodriguez's penal interest because it directly implicated him as having shot someone. (*Cheal v. El Camino Hospital* (2014) 223 Cal.App.4th 736, 758-759 [To come within Evid. Code, § 1230, "a statement need not wholly confess guilt; it need only be ' "distinctly against [the declarant's] interest." ' "].)

Rodriguez's *additional* hearsay statements to S.A about the shooting, including his *challenged* hearsay statements implicating Nunez as the aggressor in the altercation that preceded the shooting, were not "practically separable" from Rodriguez's self-inculpatory confession. (*Grimes*, *supra*, 1 Cal.5th at p. 717.) Indeed, the additional

statements were necessary to explain how Rodriguez came to shoot a man who "socked" him: (1) there were three "Black guys" on the street; (2) Nunez was arguing with one of them; (3) Nunez had had prior "drama" and "a beef" with them; (4) Nunez had been "trying to fight them"; and (5) Nunez started the altercation. Rodriguez also told S.A. that he told Nunez to get back in the car, but Nunez would not listen, so Rodriguez also got out of the car and shot one of the three men *after* the man "socked" Rodriguez.

The court could have reasonably concluded that these additional statements, even if not independently inculpatory of Rodriguez, were nevertheless against his penal interest, because " 'a reasonable man in [Rodriguez's] position would not have made the statement[s] unless he believed [them] to be true.' " (*Grimes*, *supra*, 1 Cal.5th at p. 716.) Further, none of the additional hearsay statements attempted to shift blame to Nunez for the shooting, or for any other crime in connection with the shooting. (Cf., e.g., *In re Sakarias* (2005) 35 Cal.4th 140, 154-155 [Portions of declarant's confession implicating his accomplice "could well have been held inadmissible as attempts to deflect culpability away from the declarant."].) In confessing to S.A., Rodriguez was effectively assuming full criminal responsibility for the shooting. (*Grimes*, at p. 717.) Unquestionably, Rodriguez appeared to be blaming Nunez for starting the altercation that preceded the shooting and for getting Rodriguez into the situation in which he ended up shooting the man who "socked" him. But the statements implicating Nunez for starting the altercation were not an attempt to shift criminal liability to Nunez for the shooting. Nothing Rodriguez said to S.A. indicated that Nunez aided and abetted Rodriguez in the shooting or suggested that Nunez committed any other crime.

G. *Substantial Evidence Supports Nunez's First Degree Murder Conviction*

Nunez was prosecuted for the first degree murder of Kofu based on the theory that Nunez *directly* aided and abetted Rodriguez in the commission of the first degree premeditated murder—that is, based on the theory that Nunez acted "willfully, deliberately, and with premeditation as an aider and abettor." (CALCRIM No. 521.) Nunez claims that insufficient evidence supports his first degree murder conviction because insufficient evidence shows that he "directly aided and abetted" the premeditated murder of Kofu. We find no merit to this claim.

1. Applicable Legal Principles

"There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime.' " (*People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*), superseded by statute in part as stated in *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*).) This first form of aider and abettor liability is known as direct aider and abettor liability. (See *Chiu*, at pp. 166-167.) " 'Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' " (*Id*. at p. 158.)

In *Chiu,* our Supreme Court held that aiders and abettors can only be convicted of first degree premeditated murder under a direct aiding and abetting theory; they cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine. (*Chiu*, *supra*, 59 Cal.4th at pp. 166-167.) Like second degree murder, first degree premeditated murder is the unlawful killing of a human being with

68

malice aforethought, but unlike second degree murder, first degree premeditated murder has the additional elements of willfulness, premeditation, and deliberation. (*Id.* at p. 166.)

As stated in *Chiu*, in order to convict a defendant of first degree premeditated murder as a direct aider and abettor, "the prosecution must show that the defendant aided or encouraged the commission of the murder *with* knowledge of the unlawful purpose of the perpetrator *and* with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu*, *supra*, 59 Cal.4th at p. 167, italics added.) That is, a direct aider and abettor to first degree premeditated murder must aid or encourage the direct perpetrator in the commission of the murder and act with his or her own willfulness, premeditation, and deliberation. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

In accordance with these principles, Nunez's jury was instructed that it could find Nunez guilty of first degree premeditated murder "if the People have proved that he acted willfully, deliberately, and with premeditation as an aider and abettor. The defendant acted willfully if he also intended to kill. The defendant acted deliberately if he also carefully weighed the considerations for and against his choice and, knowing the consequences, intended to kill. The defendant acted with premeditation if he also decided to kill before the acts that caused death were completed. The length of time the person spends considering whether to kill does not determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not

69

deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time . . . ." (CALCRIM No. 521.)

The applicable standard of review is well settled. In considering a claim that insufficient evidence supports a criminal conviction, our task as a reviewing court is to determine whether the entire record, viewed in the light most favorable to the judgment, contains substantial evidence—evidence that is reasonable, credible, and of solid value— from which a rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 (*Johnson*).)

We presume in support of the judgment the existence of every fact the trier of fact could have reasonably deduced from the evidence. (*People v Thompson* (2010) 49 Cal.4th 79, 113.) We apply the same standard of review whether direct or circumstantial evidence is involved. (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.) Reversal is required only if "upon no hypothesis whatever is there sufficient substantial evidence" to support the verdict. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

2. <u>Analysis</u>

Nunez claims there was insufficient evidence that he "knowingly and intentionally instigated or assisted Rodriguez" to "deliberately, willfully, or with premeditation" shoot and kill Kofu. He notes there was no evidence that he and Rodriguez "purposefully set out together to the location with the intent of finding and killing Kofu, a member of a rival gang, or anyone." He also argues that " 'sacala,' " which J.V. heard him say to Rodriguez after he got out of his car and challenged Kofu to a fight, means " 'get it out,'

70

" but does not mean, " 'Get it out and shoot.' " He concedes that his telling Rodriguez to " 'get it out' " supports a reasonable inference that he wanted Rodriguez to brandish his shotgun at Kofu, in order to instill fear in Kofu and to stop his confrontation with Kofu. He claims, however, that his use of the word " 'sacala' " does not support a reasonable inference that he directed Rodriguez to shoot and kill Kofu, and that he did so with premeditation and deliberation.

Although we agree with Nunez that there was no evidence that Nunez and Rodriguez premeditated and deliberated the shooting and killing of Kofu before Nunez began arguing with Kofu, Nunez's jury reasonably could have inferred that Nunez intended for Rodriguez to shoot and kill Kofu, and that Nunez did so with premeditation and deliberation, when Nunez told Rodriguez, "sacala," meaning, in context, to get out his shotgun. This inference is supported by the entire record, including the gang evidence, Nunez's status as an associate of the EMF gang, Nunez's knowledge that Rodriguez was an EMF gang member and was armed at the time of the shooting, and Nunez's actions and statements before and at the time of the shooting.

As the People point out, Nunez had family in El Monte and in the EMF gang. He was an EMF gang associate. As such, he had reason to know about the EMF gang's values, and that respect was one of the EMF gang's essential principles. Claiming a neighborhood was an important way for a gang member to maintain respect. EMF gang members carried firearms and were expected to use them to fend off rivals. EMF gang members exhibited "particular discontent" and hatred toward African-Americans, and EMF gang members would target and confront African-Americans. Kofu was a member

71

of an African-American-affiliated gang known as "the Bloods," and Kofu routinely wore a red bandana to signify his gang affiliation. Before the shooting, Nunez had "drama" and "beef" with Kofu, and Nunez had "been trying to fight" Kofu.

In this context, Nunez's actions and statements at the time of the shooting show that, with premeditation and deliberation, he intended and directed Rodriguez to shoot and kill Kofu. Nunez was driving by Kofu's house with Rodriguez, an EMF gang member, as his passenger, knowing Rodriguez was armed. After Kofu yelled at the two of them to pick up beer bottles they had thrown from Nunez's car, Nunez began arguing with Kofu, stopped his car, got out, continued arguing with Kofu, and challenged Kofu to a fight.[16] At some point, Nunez aggressively told Kofu, "I'm not going to pick that mother fucking shit up." And, after Nunez got out of his car, J.V. saw that Nunez appeared to be "challenging [Kofu] to a fight." Then, after Nunez and Kofu had put up their fists and Kofu began to approach Nunez, Nunez yelled to Rodriguez, " 'Sacala huey,' " or " 'Get it out.' " Rodriguez then got out of the car and shot Kofu.

The 911 caller reported hearing one shot, then someone began yelling, " 'No, no, I'm sorry, I'm sorry.' " Another person then said, " 'I told you not to fuck with me.' " After that statement, the 911 caller heard two more shots. Although the People claim

---

[16] The evidence showed that Nunez could have driven away from Kofu, but that Nunez instead chose to get out of his car and engage in an altercation with Kofu, with whom he had a prior "beef" and disliked. When asked multiple times during his police interview why he got out of his car instead of driving away, Nunez gave weak and inconsistent answers that the members of his jury reasonably could have discredited. Nunez claimed he had to stop his car because other cars were passing him in both directions, and because Kofu was threating him. He said he intended to "run" after he got out of his car, and that he did want to get out of his car.

72

it was never "conclusively established" who made the statements reported by the 911 caller, the evidence supports a reasonable inference that Kofu was the one who was saying, " 'No, no, I'm sorry, I'm sorry,' " after he was shot the first time, and that Nunez was the person who then said to Kofu, " 'I told you not to fuck with me.' " During his police interview, J.V. told Detective Ferreira that J.V. heard Nunez say, " 'I told you not to fuck with me.' " It also made sense that Kofu was the one who was apologizing and begging for his life because he had just been shot in his leg, and Rodriguez still had the gun.

In the context of the entire record, including the gang evidence, Nunez's statement to Kofu, "I told you not to fuck with me," strongly indicated that Nunez knew and intended that Rodriguez would shoot and kill Kofu when Nunez told Rodriguez to "get it out" meaning get his gun out. The record also supported a reasonable inference that Nunez carefully weighed the considerations for and against his choice of telling Rodriguez to get his gun out and, knowing that Rodriguez would use the gun to shoot and kill Kofu, directed Rodriguez to get his gun out. Indeed, almost immediately after Nunez told Kofu, " 'I told you not to fuck with me,' " Rodriguez fired two *more* shots into Kofu's legs, killing him.

Nunez's actions following the shooting were also consistent with the actions of a person who had just willfully and with premeditation and deliberation, directed an EMF gang member to shoot and kill a rival gang member. If Nunez had not shared Rodriguez's premeditated and deliberate intent to shoot and kill Kofu, Nunez might have asked Rodriguez why he shot Kofu. Additionally, Nunez could have run away on foot or

73

sped away in his car before Rodriguez got back into his car. Instead, Nunez got in his car and encouraged Rodriguez to " 'Hurry up. Get in fool. Get in. Let's go.' " Rodriguez was acting "nonchalant[ly]" and "taking a little bit of time to get into the car." Thus, Nunez could have separated himself from Rodriguez, but chose not to do so and encouraged Rodriguez to get in his car. Then, after they drove away from the scene of the shooting, Nunez drove Rodriguez to several different places, including the mall and a gas station. Nunez also did not report the shooting to authorities, even after he was outside of Rodriguez's presence. Based on all of the evidence before it, Nunez's jury reasonably could have inferred that Nunez intended for Rodriguez to shoot and kill Kofu, and that Nunez did so with premeditation and deliberation.

H. *Neither the Instructions Nor the Prosecutor's Arguments Allowed Nunez To Be Convicted of First Degree Premeditated Murder Based on an Invalid Ground*

Nunez's jury was instructed on second degree murder pursuant to CALCRIM No. 403. Nunez claims that this instruction, coupled with the prosecutor's arguments, did not adequately inform Nunez's jury that it could not convict Nunez of first degree premeditated murder based on an invalid legal theory—that is, based on a natural and probable consequences theory, or based on Rodriguez's willfulness, deliberation, and

premeditation, rather than on Nunez's mental state.[17]

We find no merit to these claims. As we explain, the entire record shows there is no reasonable likelihood that Nunez's jury misconstrued the court's instructions, including CALCRIM No. 403, or the prosecutor's arguments, as erroneously allowing it to convict Nunez of first degree premeditated murder based on a legally invalid ground.

1. Background

As noted, under our Supreme Court's 2014 decision in *Chiu*, an aider and abettor cannot be liable for first degree premeditated murder based on a natural and probable consequences theory; instead, aider and abettor liability for premeditated murder "must be based on direct aiding and abetting principles." (*Chiu*, *supra*, 59 Cal.4th at pp. 158-159.) In keeping with *Chiu*, Nunez's jury was instructed on first degree premeditated murder pursuant to CALCRIM No. 521, which stated that Nunez was guilty of first

---

**[17]** The People argue that Nunez has forfeited his claims that CALCRIM No. 403 was subject to an erroneous interpretation by Nunez's jury, and that the prosecutor's argument compounded the error because Nunez's counsel did not object to either the instruction or to the prosecutor's argument in the trial court. We agree.

Although claims that an instruction incorrectly states the law do not require an objection because all such claims are treated as affecting the defendant's substantial rights, the distinct claim that an otherwise correct instruction was insufficiently clear is forfeited unless a modifying or clarifying instruction was requested. (*People v. Capistrano* (2014) 59 Cal.4th 830, 875, fn. 11; § 1259.) Nunez challenges CALCRIM No. 403, not on the ground that it incorrectly stated the law, but on the ground that it was insufficiently clear. Thus, Nunez has forfeited this claim by failing to request a modifying or clarifying instruction. Likewise, claims of prosecutorial error during closing argument are forfeited on appeal unless a timely and specific objection to the argument, together with a request that the jury be admonished to disregard it, was made below. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1339-1342.) Because Nunez did not object to the prosecutor's argument of which he now complains, he has forfeited this claim. Despite the forfeitures, we find no merit to the claims.

75

degree premeditated murder if the People have proved that Nunez "acted willfully, deliberately, and with premeditation as an aider and abettor."

CALCRIM No. 521 further stated that "[t]he requirements for second degree murder based on express or implied malice and/or the natural and probable consequence theory are explained in CALCRIM No. 520.  First or Second degree murder with malice aforethought in CALCRIM No. 403.  The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. . . ." CALCRIM No. 520 defined the elements of murder, including express and implied malice, and instructed that if the jury decided that Nunez committed murder, it was second degree murder unless the People proved it was first degree murder, as defined in CALCRIM No. 521.

CALCRIM No. 403 stated that Nunez was guilty of second degree murder if the People proved:  (1) Nunez was guilty of either one of two nontarget crimes, challenging a person to fight in public (§ 415, subd. (a)), or aiding and abetting in brandishing a firearm (§ 417, subd. (a)(2); (2) during the commission of either nontarget crime, a coparticipant committed murder; and (3) under all of the circumstances, a reasonable person in Nunez's position would have known that murder was a natural and probable consequence of the commission of either nontarget crime.

During his closing argument before Nunez's jury, the prosecutor, while discussing murder and Nunez's "level of guilt" stated, "There's first, which under this theory, I would have to show you willful, deliberate, premeditated.  There's second degree murder, which is going to be based on this theory.  Remember these words.  The hardest

76

instruction; the one we had to change yesterday when we were reading them, 'natural and probable consequences.' I'm going to go through it. It's going to take time." Next, the prosecutor briefly referred to the instructions on manslaughter and justifiable homicide based on self-defense, and told the jury that it could consider the instructions in any order it chose. (See CALCRIM No. 640.)

The prosecutor then offered the following "suggestion" as to how the jury might consider the instructions in determining Nunez's "level of guilt": "Second degree murder, sort of a default position for murder. Right. And then there's ways to ratchet it up to first degree murder, which is like willful, deliberate, premeditated. And there's ways to go down from a murder to a manslaughter, which is heat of passion or self-defense. So maybe start at second degree murder in terms of looking at the instructions. See whether or not I've met that. And if it isn't second degree murder, you know that if it's not, you're going downward to see which crime it is. Maybe lesser. If its' possibly more, you look upward. That's just a suggestion. I always suggest that. You can deliberate however you want. That's your decision."

The prosecutor next discussed the elements of murder (CALCRIM No. 520), and argued that the evidence showed that Nunez was guilty of first degree premeditated murder. The prosecutor later stated, "So how do we determine what the intent was in this incident? Here, going back to first degree murder. Okay. I told you I'm going to go through all these elements. I told you ratch[eting] it up to a second, which I told you we proved minus self-defense, that's coming. I ratche[t] it up to a first because of willful, deliberate, and premeditated."

77

2. Applicable Legal Principles and Analysis

When, as here, a defendant claims that an instruction was subject to an erroneous interpretation by the jury, the defendant must demonstrate a reasonable likelihood that the jury interpreted the instruction in the way the defendant claims. (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) In addressing a claim of jury misinstruction, we assess the instructions as a whole, viewing the challenged instruction in context with the other instructions, to determine if there was a reasonable likelihood that the jury construed or applied the challenged instruction in an impermissible manner. (*People v. Jennings* (2010) 50 Cal.4th 616, 677.) Likewise, when a claim of prosecutorial error is based on the prosecutor's argument, we determine whether there is a reasonable likelihood that the jury construed or applied any of the prosecutor's remarks in an objectionable fashion. (*People v. Morales*, *supra*, 25 Cal.4th at p. 44.)

Nunez claims that CALCRIM No. 403, the instruction on second degree murder based on natural and probable consequences doctrine, did not "make it clear" that Nunez's jury "could not do as the prosecutor suggested: first, find second degree murder . . . then 'ratchet it up' to first degree murder if the jurors found Nunez acted 'deliberately' by stopping his car, getting out, challenging the victim to fight, and telling Rodriguez to 'Get it out.' " This argument is unavailing for two reasons: (1) the instructions as a whole prohibited Nunez's jury from convicting him of first degree premeditated murder based on a natural and probable consequences theory, or based on Rodriguez's rather than on Nunez's willfulness, deliberation, and premeditation; and (2) Nunez misconstrues the prosecutor's arguments.

78

We begin with the instructions.  CALCRIM No. 403 concerned liability for second degree murder, not first degree premeditated murder, and accurately stated the applicable law for second degree murder.  CALCRIM No. 403 made it clear that the natural and probable consequences doctrine applied *only* to second degree murder, not to first degree premeditated murder.

Additionally, CALCRIM No. 521, the instruction on first degree premeditated murder, and the instructions on aiding and abetting (CALCRIM Nos. 400, 401), correctly informed the jury that, in order to convict Nunez as an aider and abettor to the first degree premeditated murder of Kofu, Nunez's jury had to find that (1) Nunez, knowing that Rodriguez intended to shoot and kill Kofu, aided, facilitated, promoted, encouraged, or instigated Rodriguez to shoot and kill Kofu, and that (2) Nunez did so with willfulness, premeditation, and deliberation.   CALCRIM No. 521 also told the jury that the People had the burden of proving beyond a reasonable doubt that the killing of Kofu was first degree murder rather than a lesser crime.  Likewise, CALCRIM No. 520, which defined the elements of murder, told the jury that, if it found Nunez guilty of murder, it was "murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM  No. 521."  Thus, the instructions as a whole prohibited Nunez's jury from convicting Nunez of first degree premeditated murder based on a natural and probable consequences theory, or based on Rodriguez's rather than on Nunez's state of mind.

Regarding the prosecutor's arguments, the prosecutor did not suggest that Nunez's jury could find Nunez guilty of second degree murder based on a natural and probable

79

consequences theory and, without more, simply "ratchet it up" to first degree premeditated murder. Rather, the prosecutor made it clear to the jury that it could "ratchet" it up to first degree murder *only* if it found that Nunez acted with willfulness, deliberation, and premeditation when he aided and abetted Rodriguez in committing the murder.

Nor did the prosecutor suggest that Nunez was guilty of first degree premeditated murder if the jury found that Rodriguez, but not Nunez, acted with willfulness, deliberation, and premeditation. Nunez claims the prosecutor misleadingly suggested that Nunez acted with deliberation when Nunez stopped his car, got out, and told Rodriguez to " 'Get it out.' " To be sure, the prosecutor stated, "And how do we know . . . Mr. Nunez aided and abetted Mr. Rodriguez? Well, he's the one [who] told Mr. Rodriguez to get it out. There's no gun involved in this case until Mr. Nunez tells him, 'Get it out.' So it's deliberate."

But immediately thereafter, the prosecutor read part of CALCRIM No. 521 to the jury and discussed, in some detail, the evidence that Nunez acted with deliberation: "Defendant acted deliberately if he carefully weighed considerations for and against his choice and knowing the consequences, intended to kill." The prosecutor told the jury to "keep the facts in mind" in determining whether Nunez deliberated "what he did," and urged the jury to focus on what Nunez knew, and the choices that Nunez had available to him, when he told Rodriguez to " 'Get it out.' " He noted that Nunez started the fight with Kofu, and that Nunez could have backed down from the fight, gotten back in his car, and driven away, but that Nunez instead told Rodriguez to " 'Get it out.' " The argument

80

properly suggested that when Nunez told Rodriguez to " 'Get it out,' " Nunez *knew* that Rodriguez would "get out" his shotgun and use it to shoot and kill Kofu.

The argument was proper, and there is no reasonable likelihood that Nunez's jury misconstrued it as allowing the jury to convict Nunez of first degree premeditated murder, without finding that Nunez deliberated the choices for and against telling Rodriguez to "get it out," or to shoot and kill Kofu, before Nunez did so.

In a similar vein, Nunez claims the prosecutor "repeatedly argued" that Nunez's premeditation was shown by "*acts of the shooter*," that is, by acts of Rodriguez. This claim also misconstrues the prosecutor's argument, particularly his discussion of premeditation. After discussing deliberation, the prosecutor turned to premeditation, telling the jury, in reference to CALCRIM NO. 521, that "[a]ll it says is decided to kill before completing the acts which caused death."

Next, the prosecutor pointed out that the fatal gunshot wounds to Kofu's legs were the acts that caused death, and asked, "So did he [Nunez] decide to kill before the acts that caused death?" The prosecutor then argued that, regardless of whether Nunez or Rodriguez said, " 'I told you not to fuck with me,' " after the first shot was fired, the statement showed that the murder was considered before the statement was made. The prosecutor said it was up to the jury to decide who made the statement, but after the statement was made, Nunez waited for Rodriguez to get back into his car, and helped Rodriguez "flee to gang territory, even helping pump the gas on the way there. It's willful, deliberate, and premeditated."

This part of the prosecutor's argument merely urged the jury to infer that Nunez's statements and actions before, during, and after the shooting showed that Nunez aided and abetted Rodriguez in committing the shooting with Nunez's own willfulness, deliberation, and premeditation. There is no reasonable likelihood that anything about the prosecutor's discussion of premeditation misled the jury to convict Nunez of first degree premeditated murder based on a finding Rodriguez, but not Nunez, acted with willfulness, deliberation, and premeditation.

Lastly, Nunez points out that, while discussing jury instructions with counsel, the trial court said it intended to modify CALCRIM No. 521 to clarify, as Nunez puts it, "the intent and deliberation required of an aider and abettor" to first degree premeditated murder, but the clarifying language did not "make its way" into the instruction given to Nunez's jury. Indeed, the court said it would modify the pattern instruction, CALCRIM No. 521, to state that defendant Nunez acted willfully if he, "*along with the perpetrator*," *Rodriguez*, intended to kill, and to further state defendant Nunez acted deliberately if he, "*along with the perpetrator*," *Rodriguez*, carefully weighed the considerations for and against his choice, and, knowing the consequences, "intended to kill."

These modifications were not made to the version of CALCRIM No 521 that was given to Nunez's jury. But the modifications were unnecessary because the instructions on murder, and on aiding and abetting (CALCRIM Nos. 400, 401, 403, 521), prohibited Nunez's jury from convicting Nunez of first degree premeditated murder unless it found that Nunez acted willfully, deliberately, and with premeditation in aiding and abetting Rodriguez in committing the murder of Kofu.

82

Thus, we find no merit to Nunez's contention that the instructions, coupled with the prosecutor's argument, permitted Nunez's jury to convict Nunez of first degree premeditated murder based on an invalid legal theory—that is, based on a natural and probable consequences theory, or based on Rodriguez's willfulness, deliberation, and premeditation, rather than on Nunez's mental state.

I. *Nunez Is Not Entitled to Have His First Degree Premeditated Murder Conviction Reversed Based on Senate Bill No. 1437*

On September 1, 2018, the Governor signed Senate Bill No. 1437 (Senate Bill 1437) into law, effective January 1, 2019. (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722.) The bill was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

Senate Bill 1437 amended section 188, which defines malice, amended section 189, which defines the degrees of murder, and added section 1170.95 to the Penal Code. (Stats. 2018, ch. 1015, §§ 2, 3, 4; *People v. Lombardo* (2020) 54 Cal.App.5th 553, 556.) The amendments to sections 188 and 189 eliminated liability for second degree murder under the natural and probable consequences doctrine. (*Lombardo*, at p. 556.) Subject to exceptions not applicable here, the amendments to sections 188 and 189 require that a principal in a crime must act with malice in order to be convicted of murder. (*Ibid*.)

Section 1170.95 permits persons convicted of felony murder, or murder under a

natural and probable consequences theory, to petition the sentencing court to vacate the murder conviction and be sentenced on any remaining counts, where: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(3); *People v. Martinez*, *supra*, 31 Cal.App.5th at p. 723.)

Nunez claims that, under the *Estrada*[18] rule, Senate Bill 1437 applies retroactively to all judgments of conviction and sentence that, like his, were not final on appeal when the legislation became effective on January 1, 2019. He claims the bill entitles him to reversal of his *first degree* premeditated murder conviction on this direct appeal from the judgment because the record does not demonstrate beyond a reasonable doubt that his jury relied on a legally valid theory to convict him of first degree premeditate murder, rather than on a legally invalid natural and probable consequences theory. This claim is unavailing for at least two reasons.

First, and for the reasons explained, the instructions to Nunez's jury prohibited it from convicting Nunez of the first degree premeditated murder of Kofu based on a

---

[18] *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).

natural and probable consequences theory. Instead, the instructions only allowed Nunez to be convicted of first degree premeditated murder as a *direct* aider and abettor to Rodriguez. (See CALCRIM No. 521.) Thus, the record shows beyond a reasonable doubt that Nunez was *not* convicted of first degree premeditated murder based on a natural and probable consequences theory.

Second, and even if Nunez could show entitlement to relief from his first degree premeditated murder conviction in this direct appeal from the judgment of conviction, since the parties filed their respective briefs in this appeal, our Supreme Court has held that "the ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Gentile*, *supra*, 10 Cal.5th at pp. 851-859.) Thus, Nunez's sole remedy for relief under Senate Bill 1437 is to petition the sentencing court to vacate his first degree premeditated murder conviction under section 1170.95. (*Id.* at pp. 852, 859.) We express no view on the merits of such a petition.

J. *Substantial Evidence Supports the Primary Activities Element of the Gang Enhancements on Nunez's Murder Conviction (§ 186.22, subds. (e), (f).)*

Nunez claims insufficient evidence supports the gang enhancement on his murder conviction, and the enhancement must be reversed because the prosecution failed to adduce substantial evidence of the primary activities of the EMF gang. (§ 186.22, subds. (e), (f).) We find no merit to this claim.

1. Background

When Detective Lopez testified before Nunez's jury, the prosecutor asked him to describe the primary activities of the EMF gang. The detective responded: "The membership is involved in a variety of crimes, but the more common crimes that we investigate are robberies, carjackings, assaults with deadly weapons, drug dealing, . . . illegal weapon possession, car burglaries, [and] residential burglaries. Those are just some of the various crimes they commit." The detective further testified that the EMF gang had been involved in "shootings" and "murders."

Based on certified court documents, the detective also testified that certain EMF gang members had committed six predicate offenses: (1) an August 2015 murder; (2) unlawful firearm possession in October 2015; (3) vehicle theft and unlawful firearm possession in October 2016; (4) attempted carjacking in January 2017; (5) vehicle theft in February 2017; and (6) vehicle theft in January 2010.

2. Applicable Legal Principles

Section 186.22 provides for sentencing enhancements on felonies committed "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1).) A "criminal street gang" means "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying symbol, and whose members individually or

collectively engage in, or have engaged in, a pattern of criminal gang activity." (*Id*. at subd. (f).)

Thus, the "criminal street gang" component of a gang enhancement requires proof of three essential elements: "(1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.' " (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222.)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) "[E]vidence of either past or present criminal acts listed in subdivision (e) of section 186.22 is admissible to establish the statutorily required primary activities of the alleged criminal street gang." (*Ibid*.)

*Sengpadychith* offered two examples of evidence that might be sufficient to prove the primary activities element: "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324.) Sufficient proof might also consist of expert testimony that the gang was primarily

engaged in one or more statutorily enumerated offenses—based on the conversations the expert had had with the gang's members, the expert's personal investigations of crimes committed by the gang's members, or information from other law enforcement personnel and agencies. (*Ibid.*)

In considering a sufficiency of the evidence claim, our task is to review the record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value—substantial evidence—such that a rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt. (*Johnson*, *supra*, 26 Cal.3d at p. 578.) This standard of review also applies to claims that insufficient evidence supports a gang enhancement. (See *People v. Duran* (2002) 97 Cal.App.4th 1448, 1464-1465.)

3. <u>Analysis</u>

Nunez claims that Detective Lopez's testimony was "too vague and conclusory" to qualify as sufficient evidence that one or more of the EMF gang's "primary activities" was the commission of one or more of the criminal acts enumerated in section 186.22, subdivision (e), paragraphs (1) to (25), or (31) to (33). We disagree.

At the outset, we consider the context of Detective Lopez's response. The detective's answer came in response to a question about the EMF gang's primary activities. The detective noted that the gang was involved in a "variety of crimes," but in response to the question, only addressed the gang's more "common crimes." There is a reasonable inference that, by not addressing the gang's entire variety of crimes, the detective was addressing the gang's primary activities, as opposed to all of its activities.

More specifically, when asked to described "the primary activities" of the EMF gang, the detective responded: "The membership is involved in a variety of crimes, but the more common crimes that we investigate are robberies, carjackings, assaults with deadly weapons, drug dealing, . . . illegal weapon possessions, car burglaries, [and] residential burglaries. Those are just some of the various crimes they commit." At least five of the crimes that the detective mentioned—assaults with deadly weapons, robbery, burglary, carjacking, and unlawful firearm possession—are enumerated offenses. (§ 186.22, subd. (e)(1), (2), (11), (21), (31).)

Although the detective did not expressly state that the commission of one or more of these five enumerated offenses was the EMF gang's " 'chief' " or " 'principal' " occupation (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 323), the detective clearly implied that the EMF gang *consistently and repeatedly* committed these crimes when he said that the crimes he listed were among "the more common crimes" that the EMF gang's members committed, and that he and other law enforcement officers investigated. Thus, the detective also clearly implied that he knew, from his own personal experience, that the gang consistently and repeatedly engaged in the commission of these enumerated offenses. His testimony thus sufficiently showed that the EMF gang's primary activities included the commission of one or more enumerated offenses. (§ 186.22, subds. (e), (f).)

Nunez compares Detective Lopez's testimony to the expert gang testimony that was held insufficient to support the primary activities element in *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*). There, when asked about the gang's primary activities, the gang expert replied: " 'I know they've committed quite a few assaults with

89

a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (*Id*. at p. 611.) *Alexander L.* reasoned that this expert testimony was insufficient to support the primary activities element because it lacked an adequate foundation. (*Id*. at p. 612.) The court explained that expert testimony must "*be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates*" and "any material that forms the basis of an expert's opinion testimony must be reliable." (*Ibid*.) The court could not determine whether the basis of the expert's testimony was reliable, because "information establishing reliability was never elicited from [the expert] at trial. It is impossible to tell whether [the expert's] claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Ibid*.)

In contrast, Detective Lopez's testimony was based on reliable sources. The detective clearly indicated that his *knowledge* that the EMF gang's primary activities, including its members' commission of at least five enumerated offenses, was based on his and other officers' investigations of EMF gang members' commissions of the same and similar offenses. The detective regularly spoke with and read the reports of other officers about their gang crime investigations; he had shared "information, intelligence, and current crime trends on various gangs" with other detectives; and he had also spoken with victims and family members of gang members to learn information about the gang. The "vast majority" of his gang experience was with EMF gang members. Thus, in contrast to the expert testimony in *Alexander L.*, the detective's opinion that the EMF gang's

90

primary activities consisted of the consistent and repeated commission of several statutorily enumerated offenses did not lack a reliable basis or a sufficient foundation.

K. *Detective Lopez's Testimony Concerning What Was Reasonably Foreseeable to a Person in Nunez's Position Was Harmless Beyond a Reasonable Doubt*

Nunez claims the trial court prejudicially erred in instructing Nunez's jurors that it was for the jurors to decide, based on a hypothetical scenario posed to Detective Lopez which tracked the circumstances of the shooting, whether it was reasonably foreseeable that a murder would result. Nunez claims the court's instruction "improperly invoked the natural and probable consequences theory of liability for murder, which no longer supports *first or second* degree murder verdicts." (*Chiu*, *supra*, 59 Cal.4th at pp. 166-167 [natural and probable consequences doctrine does not support first degree murder convictions]; Senate Bill 1437 (2017-1028 Reg. Sess.) [amending §§ 188 and 189 to limit liability for first and second degree murder to persons who act with express or implied malice].) We find no merit to this claim.

1. Background

    (a) *Detective Lopez's disputed testimony before Nunez's jury*

When Detective Lopez testified before Nunez's jury, the prosecutor posed a hypothetical scenario that tracked the circumstances of the shooting: an EMF gang member was armed with a shot-gun while a passenger in a car, an EMF associate was driving the car, an African-American rival gang member told the associate to pick up trash that had been thrown from their car, and the EMF associate argued with the rival gang member, and challenged him to a fist fight. In this scenario, the detective agreed it

91

was "reasonably foreseeable that when this challenge to fight is taking place, [the] armed [EMF] member . . . might use [the] shotgun in order to make sure that the associate . . . [did not] lose [the] fight and the respect of [EMF]." The detective explained that using the shotgun would be a way of "demonstrating" the "dominance" of the EMF gang, and that the EMF gang member would be expected to "confront that threat [from the rival gang member] and show dominance."

In response to further questions, the detective agreed that, if the EMF associate "start[ed] backing off" from the fight, and the associate then used the phrase, " 'Get it out,' " *it was reasonably foreseeable* that the EMF gang member, the passenger in the associate's car, might use the shotgun to shoot and kill the rival gang member. Specifically, when the prosecutor asked the detective: "*Is it reasonably foreseeable to a person who's an associate in this gang when they get out in that challenge to fight that this could end up in a loss of life such as a homicide*?," Nunez's counsel objected that the question called for "speculation." (Italics added.) The court overruled the objection. The detective was then asked, and also agreed, that when the gang associate challenged the rival gang member to a fight, it could have "*end*[*ed*] *up in a loss of a life such as a homicide*." (Italics added.)

(b) *The court strikes the detective's testimony concerning what was reasonably foreseeable*

At the close of the prosecution's case, Nunez moved to dismiss the first degree murder charge, in part on the ground that there was no evidence that Nunez acted willfully, or with the intent to kill, and with premeditation and deliberation, at the time of

the shooting, when Nunez simply told Rodriguez to " 'Get it out.' " Nunez's counsel emphasized that Nunez did not say, " 'take it out and shoot.' " Nunez's counsel also noted, that, "If the DA's going [to rely] on the natural and probable consequence doctrine, that can't go to first degree; it would have to go to second degree," citing CALCRIM No. 403 and *Chiu*, *supra*, 59 Cal. 4th 155.

The court responded that it had modified CALCRIM No. 403 to provide that, if Nunez's jurors decided that Nunez did certain things that led to Kofu's death under the natural and probable consequence doctrine, then the jurors could only convict Nunez of second degree murder, not first degree murder. The prosecutor then argued that ample evidence supported a first degree murder verdict against Nunez based on a direct aiding and abetting theory. The court denied Nunez's motion.

Thereafter, the court told the prosecutor and Nunez's counsel that it had made a mistake in denying Nunez's counsel's objections to Detective Lopez's expert opinion testimony about what was reasonably foreseeable. The court noted that it had sent the prosecutor and counsel an e-mail, expressing its concern that two of the prosecutor's questions to which Nunez's counsel objected on speculation grounds, though they did not call for speculation, called for legal conclusions that invaded the province of the jury.

The questions the court believed called for legal conclusions were: " 'Is it reasonably foreseeable to a person who's an associate in this gang when they get out in that challenge to fight that this could end up in a loss of life such as a homicide?' " and " 'How about in the loss of a life such as murder?' " The detective's responses were " 'very well could' " and " 'yes.' "

93

The prosecutor argued that the detective's opinion testimony about what was reasonably foreseeable in the hypothetical scenario posed was proper under *People v. Vang* (2011) 52 Cal.4th 1038 and Evidence Code section 805. Citing *People v. Medina* (2009) 46 Cal.4th 913, Nunez's counsel argued that the challenged questions called for factual conclusions to be resolved by the jury, and the court agreed. The court reasoned that it was for the jury to decide "factually what's a reasonably foreseeable situation, not for the gang expert to testify to that."

The court later addressed Nunez's jurors and told them that the court was striking Detective's Lopez opinion testimony concerning what was reasonably foreseeable. Specifically, the court explained that it was striking the detective's two affirmative responses to the prosecutor's two questions—the detective's testimony that it was reasonably foreseeable, in the hypothetical scenario posed, that an EMF gang member might use a gun, resulting in a loss of life or a murder. The court told the members of Nunez's jury that it was for them to decide "what [was] reasonably foreseeable based on the facts" and the court's instructions.

2. Analysis

Although he did not raise the objection below, Nunez now claims that the court's order striking the detective's testimony concerning what was reasonably foreseeable to a person in Nunez's position, a gang associate who backed off from a fight and told a companion gang member to "get out" a gun, "did not cure the erroneous admission of the evidence." He notes that his jury heard the testimony on August 30, 2018, but the testimony was not stricken until September 4, giving his jury "six days to process the

94

information before learning they should not consider it." This, he argues, was too late to "unring the bell." (See *People v. Hill* (1998) 17 Cal.4th 800, 845 ["constant and outrageous" prosecutorial misconduct was difficult for jury to disregard and made it difficult for jury to remain impartial].) He argues that the court's "admonition to the jurors that it was up to them to decide what was reasonably foreseeable, [was] undoubtedly misused by the jurors, given the way the prosecutor argued" that the jury could " 'ratchet up' " second degree murder to first degree murder. He points out that an aider and abettor can only be convicted of first degree murder as a *direct* aider and abettor, and not under the natural and probable consequences doctrine. (*Chiu*, *supra*, 59 Cal.4th at pp. 166-167.) He further asserts that that Senate Bill 1437 "completely abolished" all liability for murder under the natural and probable consequences doctrine.

All of these claims concerning Detective Lopez's stricken testimony about what was reasonably foreseeable to a person in Nunez's position are unavailing, even if Nunez had preserved the claims for appeal. As explained, the record shows beyond a reasonable doubt that Nunez's jury convicted him of the first degree premeditated murder of Kofu as a *direct* aider and abettor to Rodriguez, and not under a natural and probable consequences theory. (See *Chiu*, *supra*, 59 Cal.4th at pp. 166-167.) Thus, Nunez's jury could not have relied on the detective's *stricken* testimony about what was reasonably foreseeable in convicting Nunez of first degree premeditated murder. As also explained, Nunez's sole avenue for relief under Senate Bill 1437 is to petition the sentencing court to vacate his first degree murder conviction under section 1170.95; he is not entitled to

any relief under Senate Bill 1437 in this direct appeal from his murder conviction. (*Gentile*, *supra*, 10 Cal.5th at pp. 853, 859.)

L. *No Cumulative Error for Either Defendant*

Nunez and Rodriguez each claim that the cumulative effect of the trial court's and the prosecutor's errors in their respective cases requires reversal of their respective murder convictions, even if any of the individual errors were harmless. The cumulative error doctrine does not apply to either defendant because there are no individual errors in either defendant's case. (*Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1053-1054.) Thus, defendants' claims of cumulative error lack merit.

## IV. DISCUSSION/CLAIMS OF SENTENCING ERROR

A. *Remand To Consider Imposing Lesser Firearm Enhancements Is Unwarranted*

Defendants claim that their cases must be remanded for resentencing so the court may exercise its discretion to impose lesser, uncharged firearm enhancements on their respective murder convictions. When defendants were sentenced in December 2018, the court imposed firearm enhancements of 25 years to life on their murder convictions, based on the juries' findings that a principal, namely, Rodriguez, personally and intentionally discharged a firearm causing great bodily injury or death in the commission of the murder. (§ 12022.53, subd. (d).)

"Section 12022.53 provides three different sentence enhancements for the personal use of a firearm in the commission of enumerated offenses," including murder: "a 10-year enhancement for the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (§ 12022.53,

96

subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d).)" (*People v. Yanez* (2020) 44 Cal.App.5th 452, 458 (*Yanez*), review granted April 22, 2020, S260819.)

Effective January 1, 2018, the Legislature enacted Senate Bill No. 620 (2017-2018 Reg. Sess.) (Senate Bill 620), which amended section 12022.53, subdivision (h) (Stats. 2017, ch. 682, § 2), to grant courts discretion to " 'strike or dismiss' " a firearm enhancement imposed under section 12022.53 " 'in the interest of justice pursuant to [s]ection 1385.' " (*People v. Tirado* (2019) 38 Cal.App.5th 637, 642 (*Tirado*), review granted Nov. 13, 2019, S257658.) Former section 12022.53, subdivision (h) prohibited courts from striking or dismissing firearm enhancements found true under section 12022.53, "[n]otwithstanding [s]ection 1385 or any other provision of law." (Stats. 2010, ch. 711, § 5; *Tirado*, at p. 642 & fn. 6.)

There is currently a split of authority on the question of whether Senate Bill 620 gives trial courts discretion to strike a greater firearm enhancement found true under section 12022.53 and impose a lesser included, uncharged firearm enhancement under the statute, when, as here, no lesser enhancements were pled or found true. "It is undisputed that if all three enhancements are charged and separately found true, a trial court can strike the greater enhancement under subdivision (d), reducing the firearm- related term to 20 years under subdivision (c), or also strike the subdivision (c) enhancement, reducing the term to 10 years under subdivision (b). (See *People v. Wang* (2020) 46 Cal.App.5th 1055, 1090-1091 . . . [citation].) But if lesser enhancements are not charged and found true, Courts of Appeal are split as to whether a trial court may strike a

97

greater enhancement under amended section 12022.53(h) and impose one of the lesser enhancements instead, and the issue is currently on review in [our] Supreme Court." (*People v. Delavega* (2021) 59 Cal.App.5th 1074, 1084.)

To date, this court has issued two published decisions concluding that Senate Bill 620 did not authorize courts to strike and dismiss a greater firearm enhancement *and impose* a lesser firearm enhancement that was neither pled nor found true: *People v. Valles* (2020) 49 Cal.App.5th 156, 166-167 (*Valles*), review granted July 22, 2020, S262757, and *Yanez, supra*, 44 Cal.App.5th at pages 459-460. At least two other appellate courts have reached the same conclusion: *Tirado, supra*, 38 Cal.App.5th at page 644, review granted November 13, 2019, S257658 and *People v. Garcia* (2020) 46 Cal.App.5th 786, 788-789 (*Garcia*), review granted June 10, 2020, S261772.

In *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*) at pages 221-223, the court concluded Senate Bill 620 gave courts discretion to strike a section 12022.53, subdivision (d) enhancement and impose a lesser enhancement under section 12022.53, subdivisions (b) or (c), even if the lesser enhancements were not pled or found true. *Morrison* reasoned that case law had "recognized that the court may impose a 'lesser included' enhancement that was not charged in the information when a greater enhancement found true by the trier of fact is either legally inapplicable or unsupported by sufficient evidence." (*Morrison*, at p. 222, citing, e.g., *People v. Fialho* (2014) 229 Cal.App.4th 1389, 1395-1396.) The *Morrison* court remanded the matter for resentencing because (1) the record did not indicate whether the court understood it had discretion to impose a lesser firearm enhancement in lieu of a greater one, and (2) at the

98

time of sentencing, no published decision had determined that the court had this discretion. (*Morrison*, at pp. 223-224.)

Relying on *Morrison*, defendants claim that their cases must be remanded for resentencing so the court may consider whether to strike their section 1202253, subdivision (d) enhancements *and impose* lesser enhancements under section 12022.53 subdivisions (b) or (c). They point out that, at the time they were sentenced in December 2018, no court had held that an uncharged lesser firearm enhancement could be imposed in lieu of a greater enhancement under section 12022.53, subdivision (d), in connection with striking the greater enhancement. (*Morrison*, *supra*, 34 Cal.App.5th at p. 224.)

But in *Yanez*, this court followed *Tirado*, not *Morrison*. (*Yanez*, *supra*, 44 Cal.App.5th at p. 459 ["[N]othing in the plain language of sections 1385 or 12022.53, subdivision (h) suggests an intent to allow a trial court discretion to substitute one sentencing enhancement for another."]; see also *Valles*, *supra*, 49 Cal.App.5th at pp. 165-167 (plur. opn. of Ramirez, J.) [similarly concluding that "[t]he express language of sections 1385 and 12022.53, subdivision (h)" does not "authoriz[e] the substitution of a lesser enhancement for a greater enhancement, properly found true at trial, and for which there is no legal impediment to imposition"]; but see *Valles*, at pp. 170-172 & fn. 1 (conc. opn. of Menetrez, J.) [finding insufficient basis to depart from this court's decision in *Yanez*, but agreeing with *Morrison*, noting that *Tirado* and *Yanez* "frame[d] the issue incorrectly by asking whether the amended statute 'conveys the power to change, modify, or substitute a charge or enhancement,' " and concluding that the correct question is

99

whether the court, "having exercised its power under the amended statute to strike a greater enhancement," "*still has its previously recognized power to impose an uncharged lesser*" enhancement].)  Based on this court's decision in *Yanez,* remand for resentencing on each defendant's section 12022.53, subdivision (d) firearm enhancement is unwarranted.

B. *The 10-year Term on Each Defendant's Gang Enhancement On Count 1 Must Be Stricken and Each Defendant's Life Sentence Must Be Ordered Subject to a 15-year MPEP*

The court imposed 10-year determinate terms on the gang enhancements on each defendant's murder conviction in count 1, and stayed the 10-year term for Nunez but not for Rodriguez.  Each defendant claims that these 10-year terms were unauthorized and must be stricken, and that this court must instead order that each defendant's 25-year-to-life term on count 1 be made subject to a 15-year MPEP.  (§ 186.22, subds. (b)(1)(C), (b)(5).)  The People agree, and so do we.

Under section 186.22, if a defendant is convicted of a felony, the punishment for a gang enhancement on the felony is 10 years, if the felony is a violent felony, defined in section 667.5, subdivision (c) (§ 186.22, subd. (b)(1)(C)), but if the felony is punishable by "imprisonment in the state prison for life," the punishment is to impose an MPEP of 15 years on the life term.  (§ 186.22, subd. (b)(5).)

In *People v. Lopez* (2005) 34 Cal.4th 1002, our Supreme Court held that first degree murder, which is punishable by " 'imprisonment in the state prison for a term of 25 years to life' " (§ 190, subd. (a)) is an offense punishable by "imprisonment in the

100

state prison for life," and is therefore an offense described in section 186.22, subdivision (b)(5), rather than section 186.22, subdivision (b)(1)(C). (*Lopez*, at pp. 1006-1011.)

Thus, the 10-year determinate terms imposed on each defendant's murder conviction were unauthorized and must be stricken, and the 25-year-to-life terms on count 1 must instead be ordered subject to 15-year MPEPs. (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1173 [unauthorized sentence may be corrected on appeal, despite failure to object below, and a sentence is unauthorized if " 'it could not lawfully be imposed under any circumstances in the particular case' "].)[19]

C. *Any Due Process or* Dueñas[20] *Error in Imposing the Restitution Fines and Fees Were Harmless Beyond a Reasonable Doubt for Both Defendants*

The court ordered each defendant to pay a $300 restitution fine (Pen. Code, § 1202.4, subd. (b)) and $70 in court assessments on each of their convictions. (Pen. Code, § 1465.8 [$40 per-conviction court operations assessment]; Gov Code, § 70373 [$30 per- conviction court facilities assessment].) Thus, in addition to their $300 restitution fines, Rodriguez was ordered to pay a total of $140 in court assessments on his

---

[19] In a separate argument, Rodriguez asks this court to correct clerical errors in his indeterminate and determinate abstracts of judgment concerning the length of his determinate and indeterminate terms. We direct the court on remand to prepare supplemental sentencing minute orders and amended abstracts of judgment for each defendant, reflecting our decision to strike the 10-year terms on the gang enhancements on count 1, and our imposition of 15-year MPEPs on each defendant's 25- year-to-life terms on count 1. In this way, the existing errors in each defendant's abstracts of judgment will be corrected on remand.

[20] *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*)

101

convictions in counts 1 and 2, and Nunez was ordered to pay $70 in court assessments on his conviction in count 1.

Relying on *Dueñas*, defendants claim the court violated their due process rights in imposing the restitution fines and court assessments without first determining that they had a present ability to pay them. They argue that the execution of their $300 restitution fines must be stayed, and their per-conviction court assessments vacated, unless and until the People prove they are able to pay them.

*Dueñas* was issued in January 2019, after defendants were sentenced in December 2018. *Dueñas* held that due process principles require courts to conduct an ability to pay hearing and to ascertain the defendant's present ability to pay court operations and court facilities assessments before the court may impose them. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) And, in order to avoid an unconstitutional interpretation of section 1202.4, *Dueñas* further held that courts must stay the execution of a restitution fine "until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas*, at pp. 1169-1172.)

A number of courts have held that *Dueñas* was wrongly decided. (E.g., *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067-1068; *People v. Hicks* (2019) 40 Cal.App.5th 320, 322, review granted Nov. 26, 2019, S258946; *People v. Kingston* (2019) 41Cal.App.5th 272, 279; *People v. Adams* (2020) 44 Cal.App.5th 828, 831.) Our Supreme Court is currently reviewing two questions that lie at the heart of *Dueñas*: (1) whether the court is required to consider the defendant's ability pay before it may impose or execute fines, fees, and assessments; and (2) if, so, whether the defendant or

102

the People bears the burden of proof regarding the defendant's inability to pay. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

Here, it is unnecessary to weigh-in on the question of whether *Dueñas* was wrongly decided because any due process or *Dueñas* error in imposing the restitution fine and assessments, without determining defendants' abilities to pay them, was harmless beyond a reasonable doubt in each defendant's case. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035; *People v. Aviles*, *supra*, 39 Cal.App.5th at p. 1076.)

" ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody.' " (*People v. Aviles*, *supra*, 39 Cal.App.5th at p. 1076, quoting *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837.) The same reasoning applies to determining a defendant's ability to pay court assessments.

The record shows that Nunez will be able to pay the $370 sum, and that Rodriguez will be able to pay the $440 sum, comprising their respective restitution fines and court assessments, while serving their respective sentences. Defendants are young and have job skills. Nunez was born in 1980, and Rodriguez was born in 1986. Although Nunez is diabetic, he formerly held a manufacturing job and a forklift license. Rodriguez's health is good, and he was formerly employed as an electrician. Thus, the record shows that each defendant will be able to earn prison wages while serving their sentences, and their

wages will be sufficient to cover their restitution fines and court assessments. (See *People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035.) Nothing indicates that either defendant will be unable to earn sufficient wages while in prison to pay their fines and assessments.

As defendants point out, at sentencing in December 2018, the court found that neither defendant had a present ability to pay court-appointed counsel fees or the costs of conducting their presentence investigations. Nunez also observes that he was homeless at the time of the murder. None of this means, however, that either defendant will be unable to earn sufficient wages while in prison to pay their respective restitution fines and assessments.

## V.  DISPOSITION

The 10-year term imposed for the gang enhancement on each defendant's first degree murder conviction in count 1 is hereby stricken, and the 25-year-to-life term imposed on each defendant for the murder in count 1 is hereby ordered subject to a 15-year MPEP.  (§ 186.22, subd. (b)(5).)

The matter is remanded to the superior court with directions to prepare supplemental sentencing minute orders and amended abstracts of judgment, reflecting these modifications to each defendant's sentence.  The court is further directed  to forward certified copies of defendants' abstracts of judgment to the Department of Corrections and Rehabilitation.  In all other respects, each defendant's judgment of conviction and sentence is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
_____
J.

We concur:


RAMIREZ
_____
P. J.


McKINSTER
_____
J.

105